Margaret NEWTON, et al., Plaintiffs,

v.

UNITED COMPANIES FINANCIAL CORP., et al., Defendants.

No. CIV. A. 97–5400.

United States District Court, E.D. Pennsylvania.

Nov. 5, 1998.

Irv Ackelsberg, Alan White, Community Legal Services, Inc., Philadelphia, PA, David A. Searles, Donovan, Miller, LLC, Philadelphia, PA, for Plaintiff.

Alan C. Gershenson, Blank Rome Comisky & McCauley, Philadelphia, PA, for Defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

KATZ, District Judge.

**AND NOW,** this 5th day of November, 1998, after a bench trial, the court makes the following findings of fact and conclusions of law:

*Introduction*

1. This is an action brought by four low-income homeowners against a lender with whom they each entered into high-priced mortgage loans to finance home improvements. They allege a "loan packing" scheme in which they ultimately borrowed amounts in excess of what they needed, wanted, or could afford; were charged substantial fees that were illegal and improper; and failed to receive various disclosures required by federal law. The complaint alleges violations of the Home Ownership and Equity Protection Act, the Truth in Lending Act, the Equal Credit Opportunity Act, the Pennsylvania Home Improvement Finance Act, and the Pennsylvania Uniform Trade Practices and Consumer Protection Law. Plaintiffs seek rescission of the loans and statutory damages pursuant to these several federal and state consumer protection laws.

2. Plaintiff Margaret Newton is a 76-year old homeowner who purchased her home in 1968. She purchased her home with a mortgage she obtained through a real estate office where she made payments on a weekly basis. That mortgage was paid off at the time she entered into the subject credit transaction with United. Stipulation ¶ 28. Mrs. Newton has suffered four strokes; she is unable to walk without assistance and has difficulty seeing, speaking, and concentrating. She is virtually homebound, and she is cared for on a daily basis by her daughter Claudette, who lives with her, along with Claudette's two children. M. Newton Statement; C. Newton Statement.

3. Sometime in 1995, Mrs. Newton decided to have her property improved with exterior siding and insulation. After being rejected for credit by several home improvement dealers and lenders during 1995 and 1996, she was solicited in late July 1996 by a home improvement salesman named Scott Kosit, who represented to her that he could do the job and get her the necessary financing. Kosit was acting on behalf of Affordable Vinyl Products, a home improvement dealer located in Mount Holly, New Jersey. Stipulation ¶ 29.

4. On July 25, 1996, Affordable and Mrs. Newton entered into a home improvement contract providing for the installation of siding and insulation by Affordable for a price of $9,990. Stipulation ¶ 30.

5. On or about July 24, 1996, Affordable contacted the Mt. Laurel, NJ branch of United about the possibility of extending credit to Mrs. Newton in order to fund the contract price of $9,990. During a four or five month period in 1996, the Mt. Laurel branch closed about five loans that began as telephone calls from Affordable to United. Stipulation ¶ 31.

6. The note and mortgage Mrs. Newton ultimately signed was for $15,500. At no time prior to the closing did United disclose to her in writing that this was the precise amount of the mortgage she was incurring. Included in this $15,500 figure were the following: $10,000 paid into a home improvement escrow fund maintained by the title insurance company; $1,581.65 required by United to be paid to the City of Philadelphia for delinquent real estate taxes and water bills, $525.67 in cash to Mrs. Newton, and $3,050 in points, fees, and settlement charges. Stipulation ¶¶ 43, 44.

7. On Mrs. Newton's $15,500 loan, her monthly payment was $241.33. She paid a total of $2,951.03, but she fell behind within the first year of the loan. Stipulation ¶ 48.

8. Plaintiffs Jasper and Catherine Sutton, who are both retired, obtained title to their home in 1982, after paying $100 per month for five years, on a lease-purchase basis. They also purchased a North Philadelphia row house on Ingersoll Street in 1991 for cash. Mr. and Mrs. Sutton both completed only an eighth-grade education. Stipulation ¶ 50. Prior to their loan from United, the Suttons had obtained several mortgage-secured consumer loans from Mid–Penn Consumer Discount Company. Stipulation ¶ 51.

9. In August 1996, the Suttons received a flyer offering home improvement work. They filled out the flyer indicating a desire to have doors and windows installed, sent it in, and as a result were visited by a salesman for Inner–City Community Home Improvements, Inc., a home improvement dealer. Stipulation ¶ 52. On September 4, 1996 the Suttons signed a written contract to have six new windows and two new doors installed in their home by Inner–City for $7,488. Stipulation ¶ 53.

10. The Suttons ultimately obtained a loan from United for $17,000. After their loan closing, the Suttons instructed their home improvement dealer not to proceed with the work. The funds borrowed from United were never paid out of the home improvement escrow account. Stipulation ¶ 75. The Suttons made no scheduled payments on the loan. They sent a money order to United in the amount of $111.97, which was the amount of the cash proceeds they had received. Stipulation ¶ 76. On December 27, 1996, the Suttons made a written request to United to rescind their loan. Stipulation ¶ 77. United did not accept the Suttons' payment or their rescission request, and has not satisfied the mortgage it holds on the Suttons' home. Stipulation ¶ 78. In July 1997, United commenced an action in mortgage foreclosure against the Suttons in the Philadelphia Court of Common Pleas. Stipulation ¶ 79.

11. Plaintiff Judith Fowler purchased her home in 1990 together with her mother, for cash. Ms. Fowler dropped out of school after the eleventh grade. Stipulation ¶ 80.

12. In the summer of 1996 Ms. Fowler decided that she needed work done on her home, including new doors, and contacted T & P Construction Contractors after seeing a T & P newspaper advertisement. A representative of T & P gave Ms. Fowler a contract proposal of $4,000 for four new doors and told her he would attempt to arrange a loan for her. On August 13, 1996 Ms. Fowler signed a written contract proposal for home improvement with T & P. Stipulation ¶ 81. It was understood between T & P and Ms. Fowler that no work would be done by T & P until she obtained financing. Stipulation ¶ 82.

13. T & P contacted a lender, Mego Mortgage Company, which did not agree to extend credit to Ms. Fowler. After its unsuccessful contact with Mego, T & P contacted United about the possibility of extending credit to Ms. Fowler in order to fund the contract price of $4,000. Stipulation ¶ 83. T & P completed portions of a form entitled "Borrower Information Screen" and then faxed it to Michael Borso, a loan officer at United. Stipulation ¶ 84.

14. Ms. Fowler's total loan from United was ultimately for $11,600. After Ms. Fowler's closing, only $2,000 was put into a home improvement escrow account, although the statement she signed at the closing stated that $4,000 would be put in the account. Stipulation ¶ 96. The additional amounts were used to satisfy other encumbrances on her home revealed during the title search,

but which were not discussed with her. The $2,000 was never paid out of the home improvement escrow account. Stipulation ¶ 99. T & P did not in fact perform any work, because there were insufficient funds in the account to pay the $4,000 contract price. Stipulation ¶ 100.

15. On May 17, 1997 Ms. Fowler made a written request to United to rescind her loan. Along with her written rescission request, Ms. Fowler returned the check for $49.93 that she had received from the closing agent, representing her cash loan proceeds. Ms. Fowler has not returned any other loan proceeds. Stipulation ¶¶ 101, 102. United has not satisfied the mortgage it holds on Ms. Fowler's home. Ms. Fowler made a total of two payments to United, totaling $409.31. Stipulation ¶¶ 103, 104.

16. Plaintiff Frauncine Lora Myers is a 54–year old homeowner who purchased her home in March 1982 for cash, using insurance proceeds she received following her husband's death. Ms. Myers dropped out of school in the eleventh grade. Stipulation ¶ 105. On three occasions between the time she bought her home and the 1995 loan transaction involving United, Ms. Myers financed home improvements through mortgage-secured extensions of credit. Stipulation ¶ 106.

17. In February 1995, Ms. Myers responded to a solicitation by All State Discount Builders and requested an estimate for a remodeling of her basement. Stipulation ¶ 107. On February 27, 1995 Ms. Myers signed a written contract proposal for home improvements with All State. The contract price was $14,995. The All State salesman told Ms. Myers that All State would attempt to obtain the financing for the work. It was understood between All State and Ms. Myers that no work would begin until she obtained financing. Stipulation ¶¶ 107, 108, 109.

18. The total amount Ms. Myers ended up borrowing from United was $40,300. Ms. Myers stopped making her loan payments to United after she and her son (who co-signed for the loan) lost their jobs over a year after the loan closed. She had paid United a total of $11,128.24. Stipulation ¶ 122. In February 1997, United instituted a foreclosure action against Ms. Myers in the Philadelphia Court of Common Pleas. Stipulation ¶ 123. On February 21, 1997, Ms. Myers sent United a written request to rescind her loan under the Truth in Lending Act. United has not accepted Ms. Myers's rescission request and has not taken action to cancel or satisfy the mortgage it holds on her home. Stipulation ¶¶ 124, 125.

19. Mrs. Newton, Ms. Myers, Ms. Fowler, and Mrs. Sutton are literate. They did not read the loan documents and disclosures provided to them. Stipulation ¶ 27.

20. In each of the four loans, the closing was conducted in the customer's home by Murray Levin, Esquire, an attorney retained by the title company, not United. In no case did Mr. Levin refuse to answer any of the borrowers' questions, and, in fact, it is his practice to answer any and all questions if asked. Stipulation ¶ 9.

21. This court has jurisdiction over this matter. 28 U.S.C. §§ 1331, 1367.

22. Venue is proper in this district. 28 U.S.C. § 1391(b).

*HOEPA Disclosure Notices*

23. The Home Ownership and Equity Protection Act ("HOEPA") requires delivery of special disclosures of credit terms at least three business days prior to the loan closing. 15 U.S.C. § 1639(a)-(b); 12 C.F.R. § 226.32(c).[1] Plaintiffs Newton, Suttons, and Fowler claim that United violated this provision by not timely delivering the required notice. As the parties agree in the Stipulation, the Myers loan was consummated prior to the effective date of HOEPA, so that loan is not covered and Ms. Myers is not a party to this claim.

*Findings of Fact*

24. In each of the three plaintiffs' loan files there are HOEPA disclosure forms bearing their signature. Exs. N25, S63, S172, F65. All of the plaintiffs claim that

---

1. The parties agree that the three loans are mortgages were subject to the requirements and prohibitions of HOEPA.

they did not receive the notices before closing.

25. The date printed on the respective HOEPA disclosure notices was a computer-generated date that signifies when the notice was supposed to have been delivered to the customer. The printed date is not proof that the notice was in fact delivered or signed by the customer on that date. Trial Transcript (hereafter "Tr.") Day 4, pp. 68–71, 130; Day 5, pp. 12–13.

26. Mrs. Newton signed the HOEPA disclosure form, Ex. N25, which is dated July 29, 1996, on September 3, 1996 at the loan closing in her home. Stipulation ¶ 42; Tr. Day 4, p. 144.

27. Based on the signatures (compare Ex. N25 to Ex. N2) and the testimony, it appears that this is the only one of about 30 documents that Mrs. Newton signed without her daughter Claudette's assistance. This may have occurred when Claudette left the room briefly. Tr. Day 1, pp. 72, 79.

28. Although United's loan officer James Huntington testified that he delivered the HOEPA form to Mrs. Newton's home on August 29, 1996 by placing it inside her door, Witness Statement of James Huntington, his testimony is not credible. He claims to have placed it in the Newton's unused side door, despite the fact he had previously entered the house through the main door. Tr. Day 4, p. 160. He also claims that he knocked first and no one answered. Tr. Day 4, p. 142. This detail is implausible given that Mrs. Newton is elderly and infirm and rarely leaves her home. Tr. Day 1, pp. 77–78. The main door has a mail slot. Ex. N93 (photograph). The unused door, on the other hand, is locked from the inside. Tr. Day 1, p. 75. Mr. Huntington claims that the form remained in the storm door for five calendar days, from August 29 until September 3, undisturbed and undiscovered, Tr. Day 4, pp. 163–164, despite the fact that the house was occupied by two adults and two children at a time of year when they would normally spend a portion of each day out of doors. See Claudette Newton testimony, Tr. Day 1, pp. 74–78. Mr. Huntington testified that the closing attorney, Mr. Levin, following his usual practice, inquired about the HOEPA form at closing, Tr. Day 4, pp. 143, 155, leading to its discovery in the door. In contrast, Mr. Levin testified that his practice was NOT to inquire about or review the HOEPA form, since United had assured him that the signing and delivery always took place three days before closing, and indeed, if it did not, the closing documents could not be produced by the computer. Tr. Day 2, pp. 11–13. Mr. Levin specifically denied any recollection of the events described by Mr. Huntington. Tr. Day 2, pp. 13–15. Claudette Newton, moreover, unequivocally denied that she "discovered" the HOEPA form on the closing date where Mr. Huntington claimed to have left it. Tr. Day 1, pp. 78–79. The most plausible inference from all the testimony is that Mr. Huntington presented the form to Mrs. Newton for the first time on September 3, 1996, the date of closing, and that she signed it during her daughter's momentary absence.

29. Mr. and Mrs. Sutton also first received and signed their HOEPA disclosure form at closing. The closing attorney's testimony establishes that the check marks in front of their signatures are his, despite his assertion that having United's customers sign the three-day advance disclosure at loan closings was not his usual practice. Tr. Day, pp. 17–20.

30. The United loan officer who was supposed to provide the Suttons and Ms. Fowler with their HOEPA advance disclosure, Michael Borso, had no recollection regarding the delivery of the notices to either household. Tr. Day 5, pp. 11, 15. Instead, he relies solely on the assertion that it was his general practice to properly deliver the forms. In contrast, both plaintiffs remember that there was no advance delivery of the HOEPA notice. Fowler Statement, p. 2; Sutton Statement, p. 2.

31. United Loan officer Borso's statement that he made it his uniform practice to deliver the HOEPA notices three days before closing is not credible. He admitted at trial that he structured a loan for plaintiff Judith Fowler that included payment of a broker fee to Robert Cimerol, who had no involvement whatsoever and provided no services in the

Fowler transaction. Tr. Day 5, pp. 44–59. After the presence of the additional liens caused the Fowler loan to be underfunded, Borso claimed to have discovered his "mistake" and then rewrote the loan without the broker fee. He lied to his supervisor and the title agent, telling them that the broker fee was being "waived." Ex. F147; Tr. Day 5, pp. 58–59. He also told Ms. Fowler, his supervisor, and the title agency that the contractor would perform the $4,000 home improvements for $2,000, a patently false statement and one designed to prevent his losing a commission on a loan that was not going to achieve the customer's objective. Tr. Day 4, p. 81 (McHugh testimony). Given these statements and conduct, Mr. Borso's attestation of his adherence to regular practices and faithful delivery of required disclosures three days before loan closings is not credible.

32. While United routinely created HOEPA forms containing pre-printed dates purporting to be a date of delivery and acknowledgment by the borrower, United did not maintain procedures designed to ensure that the delivery would in fact take place. For example, when calling to make an appointment with the customer for a loan closing, the loan office would not try to make an appointment for delivery of the HOEPA disclosure. Tr. Day 5, p. 17. Similarly, in contrast to the system used to track delivery of another time-sensitive disclosure (the "good faith estimate" of settlement costs), United maintained no log or notations as a record of an actual delivery of a HOEPA disclosure. Tr. Day. 4, pp. 62–67. Also, in some instances, apparently the disclosure form is brought to the consumer, signed, and then taken away and retained by United. Tr. Day 4, pp. 72–73. Finally, the closing attorney, who received standardized, written instructions from United to verify at closings that the three-day advance disclosure had been delivered, routinely failed to follow these instructions because he had been told (incorrectly) by a United manager that he did not have to worry about verifying the HOEPA delivery because the company's computer system would not allow a closing to occur unless the delivery had taken place. Tr. Day 2, pp. 11–12.

33. Ms. Fowler and the Suttons sent written demand letters to United that requested a rescission of their loans with United. United did not accept these rescission demands and took no steps to implement the rescissions. In the case of the Suttons, United commenced a foreclosure case against them. Stipulation ¶¶ 77–79, 101–03.

34. What Mrs. Newton actually received in loan proceeds as a result of her loan transaction was $245.34 paid to the City of Philadelphia for delinquent water/sewer charges and $1,336.31 for real estate taxes, and $525.67 in cash, for a total of $2,107.32. Exs. N29, 30. The home improvements she received had zero value because the siding would have to be removed and discarded in order to install the insulation that was supposed to have been installed but was not. M. Newton Statement; Statement of Melvin Esh. She paid a total of $2,951.03 on the loan. Stipulation ¶ 48.

35. What Ms. Fowler actually received in loan proceeds as a result of her loan transaction was $6,437.95 in payments on City liens ($88.58 for real estate taxes, $481.58 for water/sewer bills, $4,644.86 for bail liens, and a $250 fine), $600 paid on a prior mortgage, and $372.93 paid on a gas bill. She made payments to United totaling $409.31. Exs. 405–07; Stipulation ¶¶ 97–104.

36. What the Suttons actually received in loan proceeds as a result of their loan transaction was payment of $438.32 in real estate taxes, $171.29 in back water/sewer charges, $2,119.85 on a disputed City lien on another property they own, and $2,400 towards their obligation to Mid–Penn, for a total of $5,129.46. They did not make any payments on the loan. Sutton Statement; Exs. S45–46; Stipulation ¶ 76.

*Conclusions of Law*

37. HOEPA added consumer protections to the federal Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 et seq. The enactment of these additional protections was a Congressional determination that the type of disclosures required under TILA, and applicable to the mortgages in this case, were insufficient to ensure adequate notification to the consumer of the financial ramifications of high cost, nonpurchase money mortgages.

*See United Companies Lending Corp. v. Sargeant,* 20 F.Supp.2d 192, 203 (D.Mass.1998).

38. HOEPA requires delivery of special disclosures of credit terms at least three business days prior to the loan closing. 15 U.S.C. § 1639(a)-(b); 12 C.F.R. § 226.32(c).

39. Since its enactment in 1969, TILA has been enforced primarily by private civil actions. A consumer may sue for a fixed, statutory damage award when TILA is violated. 15 U.S.C. § 1640(a). The penalty, equal to twice the finance charge in the contract, was capped at $1,000 until 1995, when it was increased to $2,000 in the case of residential mortgage loans. The Truth in Lending Act Amendments of 1995, Pub.L. No. 104-29 § 6 (Sept. 30, 1995). In residential mortgage loans, the consumer is also entitled to rescind the loan for up to three years, in the event of enumerated "material" violations of TILA. 15 U.S.C. § 1635.

40. The rescission and damage remedies are cumulative. Since the failure to honor a valid rescission demand is itself a TILA violation giving rise to statutory damages, 15 U.S.C. § 1640(a)(3), a consumer who is entitled to rescission may also recover a statutory damage award for the creditor's failure to rescind voluntarily. *See Smith v. Fidelity Consumer Discount Co.,* 898 F.2d 896, 903 (3d Cir.1990).

41. HOEPA explicitly provided that violations of its special protection provisions would entitle consumers to rescind mortgage loans and to recover the TILA statutory penalties. 15 U.S.C. § 1639(j). In addition, the statutory damages provision was amended to increase the total award to the consumer in the case of HOEPA violations. Besides the standard $2,000 TILA penalty, the consumer may also recover an amount equal to the total finance charges and fees paid. 15 U.S.C. § 1640(a)(4).

42. TILA has always been understood to be a strict liability statute. The statutory damages are awarded in any case in which the creditor violates the specified provisions of TILA, regardless of whether the creditor's conduct was intentional, negligent, or inadvertent. *See Porter v. Mid–Penn Consumer Discount Co.,* 961 F.2d 1066 (3d Cir.1992); *Smith v. Fidelity Consumer Discount Co.,* 898 F.2d 896, 903 (3d Cir. 1990); *Thomka v. A.Z. Chevrolet, Inc.,* 619 F.2d 246, 249–50 (3d Cir.1980); *In re Brown,* 106 B.R. 852 (Bankr.E.D.Pa.1989). The only exception is specified in 15 U.S.C. § 1640(c) regarding clerical errors occurring despite the presence of procedures designed to prevent errors. This exception was neither pled nor proven by defendant in this action.

43. The HOEPA early disclosures were *not* furnished to the plaintiffs three business days prior to consummation of the mortgage transactions.

44. The amounts paid by the plaintiffs with HOEPA loans are: Mrs. Newton, $2,951.03, and Ms. Fowler, $409.31 (the Suttons did not pay anything). In each case the loan origination fees and other finance charges exceed the amounts paid. Therefore, the entire amount paid by each plaintiff may be allocated to finance charges, and the enhanced HOEPA penalty is equal to that amount.

45. As a result of United's violation of HOEPA, the Suttons, Ms. Fowler and Mrs. Newton are entitled to rescission of their loans, pursuant to 15 U.S.C. § 1635, and to awards of $2,000 each for the underlying violation of the three-day early notice provision of HOEPA, plus attorneys' fees. 15 U.S.C. § 1640(a). Mrs. Newton and Ms. Fowler are also entitled to separate, additional awards under 15 U.S.C. § 1640(a)(4) in the amount of $2,951.03 to Mrs. Newton and $409.31 to Ms. Fowler.

*HOEPA Repayment Ability*

46. In 1994, HOEPA amended TILA to forbid creditors from engaging in "a pattern or practice of extending credit ... based on the consumers' collateral without regard to the consumers' repayment ability, including the consumers' current and expected income, current obligations and employment." 15 U.S.C. § 1639(h). Plaintiffs (again, Newton, Suttons, and Fowler, but not Myers) claim that United violated this provision by making loans to them that they did not have the ability to repay.

*Findings of Fact*

47. The parties agree that United had written underwriting guidelines and parameters which required analysis of the applicant's income, monthly debt payments, residual income, debt ratio, and loan to value ratio in deciding to make a loan. Stipulation ¶ 15.

48. Each loan originated by United had to be approved by a separate underwriting department in Baton Rouge, Louisiana. Stipulation ¶ 17. During the relevant time period, United's loan approval process was initiated by a branch loan officer (sometimes referred to as a "loan originator") completing and submitting to the underwriting department a form entitled "Request for Loan Approval." The Request for Loan Approval required information to be provided as to an applicant's gross monthly income, monthly payments on the loan being applied for, an applicant's debt to income ratio, and an applicant's residual income, as well as appraised value of the anticipated collateral and loan to value calculations. Credit reports, appraisals, income verifications, employment verifications, and a typewritten application were also supplied to the underwriting department with the Request for Loan Approval. Stipulation ¶ 18.

49. During the time period July 1996 through December 1996, United's Plymouth Meeting/Allentown branch sent 298 Equal Credit Opportunity Act loan denial letters to applicants. Of the 298 denial letters, eight were based on an applicant's insufficient income; 56 were based on an applicant's insufficient credit, five were based on a combination of insufficient income and insufficient credit; one was based on a combination of insufficient income and collateral value; eight were based on a combination of insufficient credit and collateral value; 14 were based on insufficient value or type of collateral alone; four were based on a combination of insufficient credit and incomplete applications; 106 were due to incomplete applications; 75 were due to the fact that the applicant canceled; 11 were based on a lack of contact with the customer; five were based upon an assessment by United that the loan would not benefit the applicant because it would not lower the applicant's loan payments on his or her currently outstanding obligations; and five denials were made for other reasons. Stipulation ¶ 19.

50. In the same time period, the Plymouth Meeting/Allentown branch originated 125 loans. Stipulation ¶ 20.

51. In the time period July 1996 through December 1996, United's Mt. Laurel branch sent 422 Equal Credit Opportunity Act loan denial letters to applicants. Of the 411 denial letters, 22 were based on an applicant's insufficient income; 78 were based on an applicant's insufficient credit; eight were based on a combination of insufficient income and insufficient credit; five were based on a combination of insufficient income and collateral value; 15 were based on a combination of insufficient credit and collateral value; 69 were based on insufficient value or type of collateral alone; one was based on a combination of insufficient income and temporary or irregular employment; one was based on a combination of insufficient credit and incomplete application; one was based on a combination of insufficient collateral value and temporary or irregular employment; 206 were due to the fact that the applicant canceled; seven were based on a lack of contact with the customer; and nine denials were made for other reasons. Stipulation ¶ 21.

52. In the same time period, the Mt. Laurel branch originated 75 loans. Stipulation ¶ 22.

53. In the time period July 1996 through December 1996, United's Bensalem/Willow Grove branch sent at least 137 Equal Credit Opportunity Act loan denial letters to applicants. Of the 137 denial letters, eight were based on an applicant's insufficient income; 28 were based on an applicant's insufficient credit; one was due to a combination of an applicant's insufficient income and credit; four were based on a combination of insufficient income and collateral value; five were based on insufficient credit and collateral value; 22 were based on insufficient value or type of collateral alone; 49 were due to incomplete applications; 11 were due to the fact that the customer canceled; three were due to no contact from the customer; and six denials were for other reasons. United was

unable to locate any denial letters for September 1996 and December 1996 and only located two denial letters for October 1996. Stipulation ¶ 23.

54. In the time period July 1996 through December 1996, the Bensalem/Willow Grove branch originated 106 loans. Stipulation ¶ 24.

55. Between 1994 and the end of 1997, United sold 31 properties in Pennsylvania upon which it had foreclosed. In only four of those cases was the sale price more than the underlying debt and expenses actually incurred with respect to the property. In 11 of the sales, the sale price was less than half of the amount of the debt and expenses incurred, and in 22 of the 31 sales United received less than 80 percent of the amount of the debt and expenses incurred. Stipulation ¶ 25.

56. The Underwriting Manual in effect during the relevant time period defined "residual income" as follows: "The amount of monthly income remaining after the house payment and debts are paid. As a general rule, minimum required residual income is $400 per household member for fixed rate loans." Stipulation ¶ 16. The minimum residual income guideline could be outweighed by other compensating factors, for example if the customer has been successful in making payments of a comparable amount on another loan. Tr. Day 3, pp. 134–35; Provenzano Statement ¶ 14.

57. United adopted this guideline for residual income without conducting any research or study. The company's intent was to approximate in writing what it was already doing in terms of evaluating the ability of low-income households to repay loans. Tr. Day 3, pp. 154–57.

58. Plaintiff Newton is retired and disabled. At the time of her loan application, she received the following monthly checks: social security ($686) and pension ($180 and $32), for a total of $898 per month. She also received payment by Social Security of her monthly Medicare insurance premium of $46.10 per month. Stipulation ¶ 47.

59. Mrs. Newton lives with her adult daughter and her two grandchildren. As of September 1996, the monthly income of the Newton household approximately $1,360, consisting of Mrs. Newton's social security and pension checks and SSI disability benefits for her autistic grandson. M. Newton Statement. The household of four people had "residual income" of about $1,120 per month after subtracting the $241.33 loan payment to United. This did not meet United residual income standard, which was $1,600 monthly for a family with four household members.

60. United treated Mrs. Newton as a household of one, because the company said that the other three people did not need to be counted because the adult daughter and grandchildren were not dependents of Mrs. Newton's. Provenzano Statement ¶ 17. The presence of additional household members, and the fact that they lived together as a mutually dependent household would have been obvious to a loan officer seriously concerned with gathering all relevant information needed to evaluate Mrs. Newton's ability to pay her loan.

61. Newton defaulted because she was simply unable to keep up with her payment of $241.33 per month.

62. At the time of their loan application, the Suttons had a monthly income of $831.40. Mr. Sutton received Social Security income of $552.50 per month, and Mrs. Sutton received Social Security income of $278.90 per month. In addition, the Suttons occasionally received rent from their property on Ingersoll Street, which income was not considered by United in determining whether to make the loan. Stipulation ¶ 63.

63. The Suttons did not start paying, because they realized the loan was too much and they decided they did not want it.

64. Ms. Fowler was employed in August and September, 1996, the time of her loan application. United used documents (F138, F21, F22, F23, F24) to verify her income. From those documents, United derived a figure of $833 monthly income by taking the total gross income on F22 for the first eight months of 1996 and dividing by eight.

65. Ms. Fowler had one dependent, her eight-year-old son, living with her. Stipulation ¶ 90. United treated Ms. Fowler as a

household of one. Provenzano Statement ¶ 19. The loan officer who prepared her Request for Loan Approval form left the number of dependents blank on the form he completed. Tr. Day 5, pp. 28–30.

66. Ms. Fowler was simply unable to make the $204 per month payments. She made two payments and then stopped.

67. United's debt-to-income ratio guideline was 47%. Provenzano Statement ¶ 2. The actual debt-to-income ratios for the plaintiffs in this case were 28% for Mrs. Newton, 24% for Ms. Fowler, and 32% for the Suttons. Exs. N160, F79, S66.

68. The parties presented expert testimony regarding United's underwriting guidelines and default statistics. One of plaintiffs' experts, Mark Stern, opines that United's residual income guideline of $400 per month per household member (which United has since amended to $400 per adult and $200 per child) is unreasonably low. He contends that standard is based on a monthly budget well below the Census Bureau's poverty threshold, which is itself generally acknowledged within the field of social welfare to be unrealistically low. He maintains that it is generally recognized that the best standards are contained in the self-sufficiency budgets compiled by Wider Opportunities for Women, which standards provide for a much higher monthly income than do either the poverty threshold or United's residual income guidelines.

69. Plaintiffs' other expert was Dr. Anne Shlay, an applied sociologist whose research specializes in studying the decision-making practices of lending institutions. Dr. Shlay opines that United's default and delinquency figures are extremely high and reflect an underwriting pattern of making loans to people who do not have the ability to repay such loans. She reaches this conclusion by comparing United's delinquency statistics with national averages as reported in the National Delinquency Survey (for the fourth quarter

2. Dr. Shlay admits that her comparisons of United's statistics are to those of a group comprised of prime lenders. She also admits that her prior research focused exclusively on the lending practices and underwriting guidelines of prime lenders.

of 1997, the latest figures available at the time of her report) prepared by the Mortgage Bankers Association.[2]

70. Dr. Shlay places particular emphasis on the fact that 56% of United's loans included in these statistics were made in 1997 and 1998. In light of this fact, she opines, United's delinquency rates are especially alarming because it means that many very young loans are going delinquent. She explains that this is especially indicative of underwriting practices that do not sufficiently consider the borrower's ability to repay, because if the underwriting practices did a good job predicting repayment ability, borrowers would not fall behind so quickly. Over time, circumstances can change and so some borrowers will become unable to pay even if they appeared able to at the time the loan was made. Changed circumstances, though, cannot explain such high rates of delinquency in such young loans.

*Conclusions of Law*

71. HOEPA forbids creditors from engaging in "a pattern or practice of extending credit ... based on the consumers' collateral without regard to the consumers' repayment ability, including the consumers' current and expected income, current obligations and employment." 15 U.S.C. § 1639(h).

72. The Federal Reserve Board has the authority to issue regulations to implement TILA, and the Board does so in what is known as Regulation Z, found at 12 C.F.R. Pt. 226. The portion of Regulation Z pertaining to § 1639(h) states the following:

A creditor extending mortgage credit subject to this section may not ... [e]ngage in a pattern or practice of extending such credit to a consumer based on the consumer's collateral if, considering the consumer's current and expected income, current obligations, and employment status, the consumer will be unable to make the scheduled payments to repay the obligation.

Defendants' expert, Dr. Weicher, highlighted the difference between the sub-prime and conventional markets and provided useful testimony about the kind of research needed to determine reliable predictions of ability to repay in the relevant market.

12 C.F.R. § 226.32(e)(1) (1997). The Board's official commentary to this section is as follows:

> 1. Determining repayment ability. The information provided to the creditor in connection with § 226.32(d)(7) may be used to show that the creditor considered the consumer's income and obligations before extending the credit. Any expected income can be considered by the creditor, except equity income that the consumer would obtain through the foreclosure of a mortgage covered by § 226.32. For example, a creditor may use information about income other than regular salary or wages such as gifts, expected retirement payments, or income from housecleaning or childcare. The creditor also may use unverified income, as long as the creditor has a reasonable basis for believing that the income exists and will support the loan.

61 Fed.Reg. 14952, 14958 (April 4, 1996). In an earlier draft,[3] the Board explained,

> [M]any commentators were concerned that the Board intended to incorporate the income verification and debt-to-income requirements [of § 226.32(d)(7), which permits creditors to assess a prepayment penalty if the consumer's monthly debt-to-income ratio is 50 percent or less] into paragraph (e)(1). These concerns are unfounded. There is no debt-to-income ration requirement for paragraph (e)(1). The information provided to creditors in connection with paragraph (d)(7) may be used to demonstrate that the creditor considered the consumer's income and obligations before extending credit.

60 Fed.Reg. 15463, 15467 (Mar. 24, 1995).

73. The legislative history of HOEPA, in both the Senate and House Reports, explains that the purpose of the HOEPA amendments to TILA is to address the problem of "reverse redlining," which is the practice of targeting residents in certain geographic areas for credit on unfair terms. To accomplish that goal, HOEPA sets forth substantive prohibitions and notice requirements for a defined class of non-purchase, non-construction, closed-end loans with high interest rates or up-front fees as "High Cost Mortgages."[4]

74. The Senate Report does not specifically discuss the provision requiring consideration of repayment ability. In the general introduction, though, the Report describes the problem the provision is apparently aimed at correcting:

> Typically, the homeowners have limited incomes but have developed equity in their homes as a result of paying down their first mortgages, inheritance, or the rise in real estate values in the 1980's. The equity provides security for sizeable second mortgage loans. Because the borrowers have little cash flow, however, they must often struggle to meet overwhelming mortgage payments. In some instances, the struggle culminates in the borrower's loss of his or her home through foreclosure.

S.Rep. No. 103–169, at 22 (1994), *reprinted in* 1994 U.S.C.C.A.N. 1881, 1906. The Report reports that the committee heard testimony from, among other witnesses, "two elderly borrowers who had been victimized by shady second mortgage lenders." One of those was a 72–year old homeowner who was contacted by a home improvement contractor going door-to-door. By the end of the day, she had financed repairs to her home with a mortgage the monthly payment of which exceeded her monthly income. *Id.* at 22–23.

75. The House Report says this about what became § 1639(h):

> The subsection also prohibits creditors from engaging in a pattern or practice of extending mortgage credit to consumers though § 103(aa) loans unless they have given consideration to a consumer's current or expected income, current obligations, repayment capacity, or employment. These underwriting factors are intended to be illustrative, and not prescriptive or restrictive. Assessing the expected income of an employed borrower, for example, would not be necessary.

---

3. There are three earlier drafts of proposed commentary. *See* 60 Fed.Reg. 62764, 62771 (Dec. 7, 1995); 60 Fed.Reg. 15463, 15467 (Mar. 24, 1995); 59 Fed.Reg. 61832, 61835 (Dec. 2, 1994).

4. Both parties in our case agree that the loans at issue are covered by the Act.

Such an assessment, however, would be necessary for an unemployed borrower.

H.R. Con. Rep. No. 103–652, at 160 (1994), *reprinted in* 1994 U.S.C.C.A.N. 1881, 1990.

76. In a Joint Report to Congress earlier this year, the Federal Reserve Board and HUD recommended that "the Congress should consider eliminating HOEPA's 'pattern or practice' standard, so that individual consumers will have a remedy based solely on their own loans." Joint Report to Congress of Federal Reserve Board and HUD Concerning Reform to TILA and RESPA (July 17, 1998), at 63. Whether or not Congress does change the law so as to allow suits based on individual cases, that is not the law as it now exists. The court recognizes that existing law puts a harsh and perhaps unfair burden on plaintiffs.

77. Although HOEPA's repayment ability provision has not been the subject of any decisional authority, the phrase "pattern or practice" has been the subject of much litigation in the anti-discrimination area, since that phrase is used in Section 707(a) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–6(a). In the context of anti-discrimination employment cases, it has been held that in order to establish a "pattern or practice" of discrimination, plaintiffs must establish:

> More than the mere occurrence of isolated or "accidental" or sporadic discriminatory acts. [They must] establish by a preponderance of the evidence that [age] discrimination was the company's standard operating procedure—the regular rather than the unusual practice.

*Sperling v. Hoffmann–La Roche, Inc.*, 924 F.Supp. 1346, 1357 (D.N.J.1996) (quoting *Teamsters v. United States*, 431 U.S. 324, 336, 97 S.Ct. 1843, 52 L.Ed.2d 396).

■ 78. The term "pattern or practice" means much more than the existence of a few isolated examples of a potentially prohibited activity. In this case, even assuming that the loans in these individual cases were made "without regard" to repayment ability, this does not constitute a "pattern or practice" under HOEPA. To hold otherwise would allow HOEPA liability to be imposed in any instance where a few borrowers join together in one lawsuit and claim that their loans should not have been made. This was not the intent of the use of the term "pattern or practice" in the statute. Rather, the repayment ability provision was intended to prohibit wide-ranging and institutionalized practices of a lender in making loans as a matter of course without considering repayment ability and based only on the collateral value of the property.

79. The court cannot find from the evidence in this case that United has engaged in a *pattern or practice* of making loans without regard to consumers' repayment ability.

■ 80. Throughout this litigation, United has urged the argument that the fact that it has guidelines in place is conclusive of the fact it gives regard to repayment ability and is thus in compliance with HOEPA. The court rejects this argument. The mere existence of some set of guidelines does not make a lender in compliance if the guidelines are in fact deficient to accomplish their purported task.[5] Further, the individual cases here, and the way in which the loans were granted with very little regard to the guidelines, amply demonstrate that the mere existence of those guidelines does not mean that United is giving consideration to a borrower's repayment ability in deciding to make a loan.

### Conclusion

81. The defendant's underwriting standards did not prevent the lender's making loans in these three cases without regard to the borrowers' ability to repay. Plaintiff's unrebutted expert, Dr. Stern, pointed out that $400 to live on is a fiction, bearing no true relationship to the world of utility bills, taxes, telephone, transportation, medical

---

5. The court is of course completely aware of the fact that neither HOEPA nor its implementing regulations contain substantive requirements for what standards or measures a lender must use to consider repayment ability. Given its lack of expertise, and given the overtly legislative tenor of the task, the court declines to impose such requirements. What is held here is that the existence of guidelines that purport to consider repayment ability is not in and of itself all that is required for HOEPA compliance.

bills, food, clothing, and the bare necessities of life. However, showing a pattern or practice requires proof (missing here) of a representative sample of United's loans analyzed empirically and cannot be inferred from the examples selected by plaintiffs. There is a legislative proposal to rectify this admittedly heavy burden on consumers. The court recalls the defendant's underwriter's own criticism in the one case. But unforeseen job loss accounted for the default in another.

82. While the residual income standard is demonstrably flawed, the gross income to debt standard has not yet been tested as a predictor of ability to pay.[6] While most of the isolated cases selected by plaintiffs demonstrate loans made without regard to ability to repay, there is also evidence of unforeseeable downturns in family futures after the loan by job losses. Thus, plaintiffs' proofs fail both because the selected cases are not shown to be representative[7] and because there is not persuasive evidence that the income to debt ratio is an unreliable predictor of future inability to repay. Plaintiffs' selection of seven individual cases out of the universe of United's loan portfolio is not persuasive of a pattern or practice.

*ECOA Notice of Counteroffer*

83. The Equal Credit Opportunity Act ("ECOA") requires a lender to provide notice to an applicant if the lender makes a counteroffer to a completed application. In each of the transactions involved in this case United was contacted on plaintiffs' behalf about the possibility of extending them credit in the amount of their home improvement contracts, and United ultimately extended credit in significantly higher amounts, and United did not provide the plaintiffs with ECOA counteroffer notices. Stipulation, ¶¶ 31, 43, 49, 53–56, 71, 72, 83, 93, 94, 108–11, 119, 121. The question at issue is whether plaintiffs made "completed applications" for credit in the lower amounts and thus triggered United's counteroffer notice duty.

*Findings of Fact*

84. The plaintiffs' requests for home improvement loans were subject to ECOA. 15 U.S.C. §§ 1621–1691f. Stipulation ¶ 1.

85. In none of these cases did the applicant fill out a written application for credit. Instead, the applicant or a contractor or broker made an initial request, and then United gathered all the necessary information and filled out a written application.

86. In each plaintiff's case, the written application created by United, and seen for the first time and signed by each borrower at closing, does not reflect the terms of the credit requested by the plaintiff. The written "application" forms prepared by United branch employees were signed by the plaintiffs at the loan closing. None of the plaintiffs saw these written "applications" prior to closing. Stipulation ¶¶ 42, 60, 92, 118, 121.

87. The "application" forms prepared by the United branch offices contained materially different loan terms than the terms initially requested by the plaintiffs. In particular, each "application" form prepared by United set forth loan amounts determined by United, which included payment of various debts and liens for which the plaintiffs did not request credit.

88. In the case of Mrs. Newton, she did not request a loan for delinquent tax and water/sewer bills. Her request, transmitted via a home improvement dealer, was for home improvement financing in the amount of $9,990. Stipulation ¶¶ 30–31. Nevertheless, the "application" written by loan officer Huntington set forth a requested loan amount of $14,500. Compare Ex. N155 with Ex. N26; M. Newton Statement.

89. Similarly, the dealer in the Sutton case prepared a written credit application for home improvement financing and transmitted it to First Clearfield Fund, Inc., a broker. Ex. 600. Clearfield transcribed the application information on another form and transmitted it to United. Ex. S188; Stipulation

**6.** Defendant's expert outlined the types of empirical study needed to obtain differential predictors.

**7.** Plaintiffs' proofs fail even considering the Vermont records and the Myers, Trolio, Ricks/Gol-

son El and Fountain instances, since these are not shown to be representative, randomly selected or reliably persuasive evidence of defendants' practices.

¶¶ 55–56. This written application clearly states that the Suttons were seeking $7,488 for home improvement financing. They did not request any additional credit. Nevertheless, the "application" written by loan officer Borso set forth a requested loan amount of $17,000. Ex. S72; Tr. Day 2, pp. 97–98.

90. In Ms. Fowler's case, T & P Construction transmitted the home improvement contract directly to United, and made a request to United for credit on her behalf for the $4,000 price. Stipulation ¶¶ 83–84. Exhibit F115 records the initial information partly filled in by T & P, and also includes notations reflecting some of the additional amounts United decided to include that were not requested by Ms. Fowler. Tr. Day 1, pp. 49, 54. The "application" written by loan officer Borso and retained in her file set forth a requested loan amount of $11,000 instead of the $4,000 that Ms. Fowler's contractor had requested. Exs. F69–71; Tr. Day 1, pp. 49, 54.

91. In Ms. Myers' case, All–State Discount Builders, Inc. transmitted the home improvement contract, either directly or via a broker, along with an oral (or possibly written) request for credit on her behalf for the $15,000 price. Stipulation ¶¶ 110–111, Tr. Day 4, pp. 103–104. The "application" prepared by loan officer Donley and signed by Ms. Myers at her closing set forth a loan amount of $40,300. Ex. M78; Tr. Day 2, pp. 65–66.

92. None of the written and/or oral requests for credit transmitted by home improvement dealers in these four cases included any request to obtain additional funds to pay other mortgages, bail liens, judgments, credit accounts, taxes, water bills, or other debts. Sutton testimony, Tr. Day 2, pp. 97–98; Fowler testimony, Tr. Day 1, 49, 54; Myers testimony, Tr. Day 2, pp. 65–68, M. Newton Statement.

93. The plaintiffs' requests for loans to finance the home improvements were *de facto* applications for credit, in the amount of each home improvement contract.

94. United was able to determine that it would not grant credit on some occasions as soon as it obtained a title report, and before a branch office formally submitted an application to United's underwriting department. Ex. U202, Tr. Day 4, pp. 105–07, 111–12. In such a case United would have all the information needed to reach a decision, *i.e.*, a denial, and would notify the applicant. *Id.* Thus, an application could be complete for purposes of a denial at an earlier stage than if the customer appeared initially to qualify for the credit requested.

95. United is a home equity lender that generally only makes loans that are secured by a first or second mortgage on the consumer's property. Exs. U185–U186.

96. If United received a request for home improvement financing from a customer who had pre-existing liens on her home, and United could determine, based on its policy of only making first or second mortgage loans, that it would only approve credit at a higher amount, *i.e.* sufficient both to pay for the home improvement financing and to pay off the liens, United could make this determination once it had a title report on the customer's property. Tr. Day 4, pp. 58, 105–07.

97. On July 29, 1996 Mrs. Newton's contractor, Affordable Vinyl Products, transmitted her application for home improvement financing to United. Stipulation ¶ 33. United obtained a title report for Mrs. Newton that indicated that she had delinquent taxes of $1,336.31 and delinquent water/sewer charges of $249.34. Ex. N150. This report appears to have been ordered by United on July 30, 1996. Once United had this report, presumably within 48 hours of the request, Tr. Day 4, p. 61, it had sufficient information to determine that a home improvement loan to Mrs. Newton would also have to include money to pay the City lien.

98. On October 3, 1996, the broker selected by the Suttons' home improvement dealer faxed a copy of a title report along with the written application for home improvement financing. Stipulation ¶ 56. This title report revealed to United the existence of an existing mortgage held by Mid–Penn Consumer Discount Co. and of tax and water/sewer liens. Ex. S186. Thus, as of October 3, 1996, United knew that it would not lend the Suttons just the $7,488 they wanted for the home improvements without also lending

them money to pay off these pre-existing liens.

99. Ms. Fowler applied for credit with United when, on August 18, 1996, T & P Construction Contractors faxed a filled-in United form, entitled a "Borrower's Information Screen," to United. Stipulation ¶ 84. United ordered a title report for her on September 3, 1996. Ex. F126. Once the title report was obtained by United, the loan officer knew that the reported City fine and bail liens would have to be paid as part of any loan the company would be willing to make Ms. Fowler.

100. In Ms. Myers' case, on March 1, 995, United obtained a copy of her title search along with the home improvement contract. Stipulation ¶ 113. Accordingly, from the beginning of the company's processing of this application for $15,000 for her basement and even before the loan officer introduced himself to Ms. Myers, a determination had been made, based on the existence of prior judgments and liens, that the loan being processed would be for around $40,000 rather than the $15,000 she was requesting. Tr. Day 4, pp. 103–06.

101. United did offer second mortgage loans to some of its applicants in Pennsylvania in 1995 and 1996 and did in fact make second mortgages, including second mortgages for home improvements. Exs.U806–U812. However, in order to offer a second mortgage loan to a customer United had to obtain no worse than second lien position and the customer needed "B" credit or better. Provenzano Statement ¶¶ 7–8.

102. United did not at any time notify the plaintiffs in writing that it would *not* extend them credit in the amount they requested, *i.e.*, the price of the home improvements only, or of the reasons for its action. Nor did United notify the plaintiffs in writing of the reasons that they might not qualify for second or junior mortgage loans in the lesser amounts. Stipulation ¶¶ 49, 72, 94, 119.

103. In each plaintiff's case, the written "application" taken and retained by United does not reflect the terms of the credit requested by the plaintiff initially.

104. Ms. Myers initially requested credit in her own name. She met United's credit and income guidelines to qualify for credit in her name alone. Tr. Day 4, p. 129.

105. Nevertheless, United decided that it would not extend credit to her in her name only, but would require her to obtain a co-signer, namely her son Mosel Myers. Tr. Day 4, pp. 129–30; Witness Statement of Brian Donley.

106. United did not notify Ms. Myers in writing that it would not extend credit to her in her name only, or of the reasons for that decision. Tr. Day 4, p. 130.

107. United has a regular practice of "pended" applications, whereby the company in fact denies credit applications and imposes additional requirements on the consumer applicant but fails to provide any notification, either of adverse action or counteroffer, to the consumer. Ex. U203; Tr. Day 4, pp. 129–31.

*Conclusions of Law*

108. ECOA requires that "[w]ithin thirty days ... after receipt of a completed application for credit, a creditor shall notify the applicant of its action on the application." 15 U.S.C. § 1691(d)(1). The accompanying regulation (known as Regulation B) requires that written notice be given if the lender makes a counteroffer to a completed application: "A creditor shall notify an applicant of action taken within ... 30 days after receiving a completed application concerning the creditor's approval of, counteroffer to, or adverse action on the application." 12 C.F.R. § 202.9(a)(1)(i). Thus, under ECOA there are three distinct kinds of action a creditor might take, each triggering a notice requirement: an approval, a counteroffer, and an adverse action.

109. A counteroffer is an offer to extend credit in a different amount, or on other terms, than the terms requested. 12 C.F.R. § 202.2(c)(1)(i).

110. While for some purposes a counteroffer is a kind of adverse action, *see* 15 U.S.C. § 1691(d)(6) (term "adverse action" includes "a refusal to grant credit in substantially the amount or on substantially the terms requested"), Regulation B imposes dif-

ferent notice requirements on counteroffers and adverse actions. *Compare* Model Forms C–1, C–2, C–3 (sample notice of adverse action) *with* Form C–4 (sample notice of counteroffer), Appendix C to Regulation B.

111. Notice of an approval can be implicit, by granting the credit requested. Official Staff Commentary, § 202.9(a)(1)-(2). There is no provision, however, for implicit notice of either an adverse action or a counteroffer.

112. The other critical definition under the ECOA notice requirement besides "action" is "completed application," because the notice requirement is not triggered until the application is "complete." 15 U.S.C. § 1691(d)(1).[8]

113. Regulation B defines "application" as "an oral or written request for an extension of credit that is made in accordance with procedures established by a creditor for the type of credit requested." 12 C.F.R. § 202.2(f). The definition is a practical one, focusing on the creditor's actual practices in making decisions to approve or deny credit, and contemplates oral, as well as written applications, if the creditor actually makes decisions to approve or deny credit based on oral requests for credit. *See* Official Staff Commentary § 202.2(f)–1.

114. A consumer request about credit is an "inquiry" rather than an "application" when, rather than actually requesting an extension of credit, she merely seeks information about the creditor's loan terms or policies. However, the inquiry becomes an "application" once the creditor evaluates the information received and decides to decline granting the credit requested. *See id.* § 202.2(f)–3, 4.

115. The regulations define a "completed application" as

an application in connection with which a creditor has received all the information that the creditor regularly obtains and considers in evaluating applications for the amount and type of credit requested (including, but not limited to, credit reports,

any additional information requested from the applicant, and any approvals or reports by governmental agencies or other persons that are necessary to guarantee, insure, or provide security for the credit or collateral).

12 C.F.R. § 202.2(f).

116. Thus, implicit in the Board's definition of "completed application" is the possibility that a creditor might base credit decisions on different considerations and on different amounts and types of information, depending on the *amount* and on the *type* of credit requested. The commentary further instructs that "[a] creditor has the latitude under the regulation to establish its own application process and to decide the type and amount of information it will require from credit applicants." 12 C.F.R. Pt. 202, Supp. I, Staff Commentary, 2(f)(1).

117. Staff Commentary 2(f)(2) reads as follows:

" 'Procedures established.' The term refers to the actual practices followed by a creditor for making credit decisions as well as its stated application procedures. For example, if a creditor's stated policy is to require all applications to be in writing on the creditor's application form, but the creditor also makes credit decisions based on oral requests, the creditor's established procedures are to accept both oral and written applications."

118. The written and oral requests made by the home improvement dealers in the cases of Mrs. Newton and Ms. Fowler, and by the brokers in the cases of the Suttons and Ms. Myers, were *de facto* "applications" for credit within the meaning of Regulation B, 12 C.F.R. § 202.2(f), and not merely "inquiries" in that: a) United was being asked to extend credit to the plaintiffs in the specific amount of the home improvement contracts; b) United regularly evaluates such requests and makes decisions once it obtains all the information it needs; and c) United, in fact, treated these four communications as requests for credit.

---

8. The creditor must take one of two steps within 30 days after receiving an incomplete application: either notify the applicant of action taken on the application or notify the applicant that

further information is needed. *See* 12 C.F.R. § 202.9(c). Again, in either case, a notice must be sent.

119. Upon receipt of the title reports in each of the four cases, United had all the information it needed to determine that the plaintiffs would not qualify for credit in the amount they initially requested, *i.e.*, the cost of the home improvements. *See* 12 C.F.R. § 202.2(f). Thus, for purposes of evaluating plaintiffs' applications for credit in the amount of the home improvement contracts, such applications were "complete" within the meaning of Regulation B once United had received their respective title reports, meaning:

a. For Mrs. Newton, soon after July 30, 1996, the day United ordered the title search, Ex. N150;

b. For the Suttons, on October 3, 1996, when United received via fax a title report that accompanied the application and credit report transmitted by Jules Clearfield to loan officer Borso, Stipulation ¶ 56;

c. For Ms. Fowler, soon after September 3, 1996, the day United ordered a title report on her house, Ex. F126; and

d. For Ms. Myers, on March 1, 1995, Stipulation ¶ 113; Tr. Day 4, pp. 103–06.

120. United's failure to provide notice to the plaintiffs that their requests for credit in the amount of their home improvements had been denied and that United was proposing to make them loans for higher amounts, sufficient to place United in first lien position, was in violation of ECOA's notice of counteroffer requirement.

121. The analysis of this claim is made difficult by the fact that the application and approval process employed in these loans is not the process envisioned by ECOA's regulatory scheme. In fact, the process employed by United virtually precludes the applicant/borrower from actually submitting a completed application; instead, the applicant is an entirely passive participant. United here attempts to capitalize on this fact, arguing that the fact that "[p]laintiffs have been unable to point to any document in the loan files which evidences a completed application for simply a home improvement loan" is evidence that plaintiffs made no such application; but that argument ignores substance for form. United's insistence that the completed loan package its agent sends to its underwriting department as the only "completed application" involved in the transaction is misguided; the application is what happens between the prospective borrower and United, and it becomes complete when United has enough information to know it cannot extend the requested loan.

122. The way United describes the loan application and approval process—that the only completed application made was the one approved—does not adequately reflect the reality of the process, and the definition of application that results from United's version does violence to common sense. Common sense instructs that, however else it is defined, an application is something made by the applicant to the lending company, not something that happens between two divisions of the company without any participation on the part of the applicant.

123. United relies heavily on the fact that the Regulations give it "wide latitude" in determining its application procedure and what constitutes a completed application. This is true, but the Regulations instruct equally that the lender is bound by the substance of its actual practices, not merely what it chooses to call a completed application. According to United's actual practice, the applications were complete when United received the title reports, because that is when the company had all the information it required to evaluate the application for the amount and type of loan requested.

124. United contends that it is in full compliance with ECOA's notification requirement because each of these loans closed within 30 days of the loan package being sent to Baton Rouge, and therefore all the plaintiffs were notified of approval within 30 days as required by 15 U.S.C. § 1691(d)(1) and 12 C.F.R. § 202.9(a)(1)(i). By that logic, a lender would be relieved of its duty to notify the borrower of a counteroffer being made as long as that counteroffer is approved within the original 30–day period. This result is at odds with the language of the regulation, which is clear in requiring that the lender must notify the borrower of the making of a

counteroffer, not just the ultimate approval or denial of that counteroffer.

125. The facts of Ms. Fowler's case provide a particularly compelling example of the borrower not getting the loan she wanted, and of United switching the plaintiffs' application to a loan she in fact did not want. Her contractor, T & P, "contacted United about the possibility of extending credit to Ms. Fowler in order to fund the contract price of $4,000" for the installation of four doors at her house. Stipulation ¶ 83. What Ms. Fowler ended up with was a loan of $11,600, all but $2,000 of which went to pay for things other than her doors. In fact, the $2,000 that was left to fund the home improvement contract was not enough to pay for the work, so Ms. Fowler's loan for almost three times the requested amount did not even get her the doors the acquisition of which had been the purpose of obtaining the loan in the first place.

126. Mrs. Newton's case illustrates that United did not even issue a counteroffer notice upon effectively denying what it considers a completed application. When her Request for Loan Approval was sent to Baton Rouge, the underwriting department turned down that Request by "pending" the Request (which apparently was a common practice in which the loan was not explicitly denied, but left in limbo until resubmitted differently), and it was only after the loan agent spoke with the underwriting department and resubmitted the loan with different proposed terms that it was approved. Even with that change to what United insists is the completed application, Mrs. Newton was not given any notice of the initial denial or the resubmission with different terms that was ultimately approved.

 127. In addition to the failure to provide notice of counteroffer, United's decision to refuse to extend credit to Ms. Myers without a cosigner was a substantive violation of ECOA. *See* 12 C.F.R. § 202.7(d). United's failure to notify her in writing about this decision was also a violation of ECOA's notice provisions. *See* 12 C.F.R. § 202.9(a)(1)(i).

128. The foregoing conclusions, besides being supported by the language of Regula-

tion B, also rest soundly on the policy underlying ECOA. United is essentially taking the position that so long as a creditor provides any credit product to a consumer within thirty days of the consumer's request for credit, the creditor has no obligation to inform the consumer that it would not provide the credit requested. Under this view, for example, a creditor that denies an application for a home equity loan for whatever reason would have no ECOA notice obligation if it provides the consumer with any form of credit, like a credit card. Given the anti-discriminatory purposes of ECOA, this interpretation is not correct. It would enable a creditor to discriminate in its use of different loan programs, and to avoid providing any information to consumers, or to regulators, that would bring this practice to light. Such nondisclosure is inconsistent with the purposes of ECOA. *See United States v. American Future Systems, Inc.,* 571 F.Supp. 551, 563 (E.D.Pa.1982), *aff'd,* 743 F.2d 169 (3d Cir. 1984) (minority applicants not aware that creditor was processing their applications under less favorable program than that offered to white applicants).

### Conclusion

129. The prospective borrowers went into the deals with the expectation that their home improvements would be financed. The lender knew when it saw the title report that the deals required payment of inactive liens for taxes, water and sewer, bail, etc., that were not bothering the borrowers' lives in any realistic way. The law was designed to give the borrower fair notice that a counteroffer for a larger loan was in the offing within a reasonable time after the lender knew this, which was before the closing. The law was designed to avoid bait by a small loan for home improvements and switch to a large loan clearing title for a first mortgage. The practice of the lender was not to give notice of the counteroffer when it had a *de facto* completed application for the smaller loan and knew it was impracticable. Instead, the lender created the fiction that it was accepting an offer which the lender itself had created for the larger loan. Substance should govern over form.

130. In view of the fact that this is a case of first impression, the court will not award punitive damages.

### RESPA Broker Fee

131. The Suttons allege that the broker fee they paid in connection with their loan was an illegal kickback or fee split between United and the broker, in violation of the Real Estate Settlement and Procedures Act ("RESPA").

### Findings of Fact

132. After obtaining credit reports for the Suttons and determining that they would not qualify for financing from Inner–City's other lending sources, Inner–City transmitted the Suttons' contract and credit application to a loan broker, First Clearfield Fund, Inc. ("Clearfield"), on or about September 10, 1996. Stipulation ¶ 55.

133. There is no evidence that Clearfield and United had any contractual or other relationship to each other. Clearfield, as a loan broker, sent loan applications for clients to United. Stipulation ¶ 58.

134. On October 2, 1996, Clearfield prepared a written credit application on its own form and transmitted it to United. On October 3, 1996, Clearfield faxed to United a title report and credit report for the Suttons and their property. Stipulation ¶ 56.

135. On or about October 8, 1996 at the look-up visit, United's loan officer, Michael Borso, presented Clearfield's loan broker agreement to the Suttons. Stipulation ¶ 60. Under the terms of the broker agreement the Suttons agreed to pay Clearfield a percentage of the loan amount in consideration for his services in obtaining them a loan. Ex. S134. This agreement is less than one page typed, in large print, and is written in easily understandable language. Ex. S134.

136. At the October 24, 1996 loan closing the sum of $700 was paid to Clearfield as a mortgage broker fee pursuant to the broker agreement. Exs. S45–46. Plaintiffs have not proven that the services of the broker to which they stipulated were not worth $700.

### Conclusions of Law

137. The sum of $700 paid to Clearfield was bona fide compensation for the broker services rendered by Clearfield. Plaintiffs have presented no evidence that the $700 was not reasonable compensation for Clearfield's assistance in obtaining a loan for the Suttons.

138. Under RESPA, a person may not pay a fee or kickback to another for the referral of real estate settlement services. See 12 U.S.C. § 2607(a). Nor may a person give or accept a split or percentage of any charge except for services actually rendered. See 12 U.S.C. § 2607(b).

139. No liability may arise under RESPA where the payment to a third party is bona fide compensation for goods provided or services performed. See 12 U.S.C. § 2607(c).

140. In the Suttons' case, the fee paid to Clearfield was a fee paid by the Suttons from the proceeds of their loan pursuant to an agreement with Clearfield to compensate it for locating a lender (United). Plaintiffs have presented no evidence that the fee was unreasonable.

### TILA Broker Fee

141. Plaintiff Frauncine Myers alleges that the broker fee she paid in connection with her loan was required by the Truth in Lending Act ("TILA") to be disclosed as a finance charge rather than part of the amount financed. For this improper disclosure, she seeks to rescind her loan and recover statutory damages.

### Findings of Fact

142. Ms. Myers never met or spoke with John McIntyre or anyone from his company, United Capital Systems, Inc. Myers Statement. McIntyre was in California and had no prior contact or relationship with Mrs. Myers.

143. The United loan officer had Ms. Myers sign a written form purporting to authorize United to pay a percentage broker's fee to McIntyre for services allegedly already performed, a form that the loan officer, not any broker, filled out. Stipulation ¶ 114. To get the loan, Mrs. Myers had to pay the finder's fee to McIntyre.

144. Notwithstanding the documents, there was in fact no agreement or understanding between Mrs. Myers and McIntyre, and no consideration for any such contract. Tr. Day 4, p. 108 (broker performed no services after referral). On the contrary, any understanding that existed was between McIntyre and United. Stipulation ¶ 112 (35 united loans resulting from McIntyre referrals).

145. The broker was paid a fee by United solely for referring Ms. Myers' loan to United, and not for any services provided to Ms. Myers. Tr. Day 4, pp. 108, 124.

146. United paid McIntyre a fee of $1,742.73 out of the proceeds of the Myers loan. Ex. M177. This amount was included in the "amount financed," not the "finance charge," in the TILA disclosures made to Ms. Myers. Ex. M174 ("broker fee" included in "itemization of amount financed").

147. Ms. Myers sent United a written rescission demand, which United did not accept. Stipulation ¶¶ 124–25.

*Conclusions of Law*

148. For purposes of TILA requirements, a "finance charge" includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit. *See* 15 U.S.C. § 1605(a); 12 C.F.R. § 226.4(a).

149. A referral fee, or "finder's fee," is a "finance charge." *See* 15 U.S.C. § 1605(a)(3); 12 C.F.R. § 226.4(b)(3).

150. The broker fee paid from the proceeds of Ms. Myers' loan was a "finder's fee."

151. United required Ms. Myers to pay this fee, as reflected in the following:

a. There was no bona fide contract between her and the broker;

b. The broker had a pre-existing understanding or relationship with United, not with her; and

c. She had as much choice over the selection of and payment to this broker as she did

over the appraiser and his fee. *See In re Russell,* 72 B.R. 855 (Bankr.E.D.Pa.1987).

152. United failed to include the fee in the disclosed finance charge, and therefore its disclosure of the total finance charge was understated by $1,742.73. As a result, the disclosure of "annual percentage rate" was also understated.

153. As a result of these material violations of TILA disclosure rules, plaintiff Myers is entitled to rescind her loan under 15 U.S.C. § 1635, to statutory damages of $2,000 for United's failure to honor her rescission, together with costs and attorneys' fees. 15 U.S.C. § 1640.

*HIFA Claim*

154. The plaintiffs' state law claim under the Pennsylvania Home Improvement Finance Act, Pa. Stat. Ann. tit. 73 § 500–101 *et seq.* ("HIFA") challenges the legality of various charges and fees imposed by United. This claim need not be reached since, as a result of rescission relief, plaintiffs are not liable for any charges or fees at all. *See Brown v. Courtesy Discount Co.,* 134 B.R. 134, 145–46 (Bankr.E.D.Pa.1991). This claim is withdrawn by plaintiffs and, therefore, dismissed without prejudice.

*C.L. Claims*

155. Plaintiffs have asserted claims under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, Pa. Stat., tit. 73 § 201–1 *et seq.* ("CPL") as an alternative basis for remedy, on the grounds that United's conduct was unfair or deceptive within the meaning of the CPL. These claims, like plaintiffs' claims under HIFA, do not have to be reached since plaintiffs' loans are rescinded on alternative bases. The CPL claims are, therefore, withdrawn by plaintiffs and dismissed without prejudice.[9]

9. In view of the novelty and complexity of the legal and factual issues in this lawsuit, the court has determined that all the statutory penalties should run concurrently and be fixed at a total of $2,000 with respect to each of the loan transactions in dispute.