FIRST DISTRICT

July 21, 2003

No. 1-01-2045

IVER R. JOHNSON,    )    Appeal from the

)    Circuit Court of

Plaintiff-Appellant,     )    Cook County.

)

)

v. )        No. 97 CH 10793

)

)

KATHY D. THOMAS, UNKNOWN OWNERS, ) The Honorable

NON-RECORD CLAIMANTS, )    Robert V. Boharic,

) Judge Presiding.

Defendants-Appellees. )    

PRESIDING JUSTICE GORDON delivered the opinion of the court:

Plaintiff, Iver Johnson, brought a foreclosure action against defendant, Kathy Thomas, for failure to make payments pursuant to a retail installment contract for home improvement work, which was secured by a mortgage on Thomas' home.  Thomas subsequently filed a counterclaim, alleging various violations of the Truth in Lending Act (TILA) (15 U.S.C. §1601 
et seq.
 (1994)) and slander of title.  Following a bench trial, the trial court entered judgment for Thomas, awarding her $6,000 for three TILA violations and $59,901 in attorney fees and costs.  The court further ordered Thomas to pay Johnson $10,000 for the reasonable value of the work performed on her home.  Johnson appeals.

BACKGROUND

At trial, Thomas testified that she met with Marvin Bilfeld, d/b/a Davenport Construction Company, at her home in Matteson, Illinois, on July 18, 1995, to discuss a home remodeling contract.  During the meeting, Bilfeld obtained Thomas' signature on five documents: (1) a proposal specifying that the remodeling work would total $15,000 with payments to be made in 120 monthly installments of $300; (2) a blank retail installment contract (RIC), which displayed empty boxes entitled "annual percentage rate," "finance charge," "amount financed," "total of payments," "total sale price" and "payment schedule"; (3) a blank mortgage document; (4) a notice of right to cancel, which contained the name and address of Davenport Construction Company as the party to contact in the event of cancellation and displayed a blank line following the instructions "If you cancel by mail or telegram, you must send the notice no later than midnight of"; and (5) a blank wage assignment.

Thomas testified that Bilfeld told her the RIC required her to make payments to his "partner," Iver Johnson.  He stated he was responsible for the construction work and Johnson collected the payments.  He also told her that she could pay for the work in the monthly installments specified in the proposal or she could refinance her first mortgage and obtain a loan from another lender.  He suggested she contact Dolphin Mortgage Company (Dolphin) if she wished to refinance.  Thomas stated that she received a copy of the proposal and possibly the notice of right to cancel at the meeting, but did not receive copies of the other documents she signed.  Construction on her home began the following day, July 19, 1995.

After contacting Dolphin, Thomas reported to Bilfeld that Dolphin's interest rate was too high and she would pay for the work according to the terms set forth in his proposal.  Thomas testified that the documents she signed did not contain an interest rate and she was unaware that paying 120 monthly installments of $300 incorporated an interest rate of approximately 21%.

Thomas called Bilfeld in late July to report that she was not satisfied with the work of some of his subcontractors.  On August 1, 1995, Bilfeld visited Thomas' home and told her she would need to pay an additional $3,000 to have the work done to her specifications.  On that day, Thomas signed a second proposal, which provided that the specified work would be completed for a total of $18,000 to be paid in 120 monthly installments of $360.  No other documents were executed at that time.

Thereafter, Thomas continued to complain about the work performed on her home; however, Bilfeld failed to respond to her concerns.  As a result, she sent him a letter on September 30, 1995, detailing the remaining problems with the remodeling work and stating she would not make any payments until the work was done properly.  Thomas further requested that Bilfeld send her copies of all of the documents she had signed.  Upon receiving some of the documents from Bilfeld and reviewing others at a later date, Thomas learned that additional numbers had been inserted on the RIC and the notice of right to cancel after she had signed them, outside of her presence and without her approval.  Because Thomas had received copies, she did not learn the documents had also been altered using liquid paper until she was shown the originals at her deposition in the year 2000.

The documents introduced at trial showed that the boxes on the RIC had been filled in to reflect the terms of the July proposal.  Liquid paper had then been applied in certain boxes, and numbers consistent with the August 1, 1995, proposal had been written on top of the liquid paper.  The numbers written over the liquid paper provided as follows: (1) annual percentage rate -- 21.01%; (2) finance charge -- $25,200; (3) amount financed -- $18,000; (4) total of payments -- $43,200; and (5) total sale price -- $43,220.  In addition to the alterations using liquid paper, an "8" had been written over a "5" in the amount financed box, changing $15,000 to $18,000.  A "6" was also written over a "0" to change the 120 monthly payments of $300 to 120 monthly payments of $360.

According to Thomas, the notice of right to cancel had also been altered.  Thomas testified that when she signed the notice, it contained the name and address of Davenport Construction Company as the party to contact in the event of rescission and a transaction date of July 18, 1995.  Following her signing of the document, liquid paper had been applied to the transaction date, changing it to August 1, 1995.  In addition, the expiration date of the right to rescind had been written in as August 4, 1995.  None of the alterations to the RIC or the cancellation notice were initialed by Thomas and she testified that she neither gave consent for the alterations nor received copies of the documents after they were altered.

To the contrary, Bilfeld testified that on July 18, 1995, Thomas signed only the proposal and stated she wished to obtain financing elsewhere.  She later agreed to Bilfeld's financing terms and all of the documents were executed on August 1, 1995.  Bilfeld stated he applied liquid paper to the RIC because he accidentally began filling out the document using the numbers agreed to for the $15,000 contract.  Upon discovery of the error, he applied liquid paper to the incorrect numbers and completed the form consistent with the $18,000 agreement.  He stated the RIC form was the last one in his briefcase, otherwise he would have simply discarded it and filled out a new one instead of using liquid paper.  Bilfeld further testified that Thomas signed the documents after they were fully completed and that she received copies, while the original RIC was given to Johnson.  He did not, however, correct Thomas' copies with liquid paper.  He testified this was unnecessary because the revised numbers appeared clearly on the three or four carbonless copies. Finally, Bilfeld admitted that the mortgage document was blank when Thomas signed it and that the necessary information was subsequently typed in by Johnson.  He further admitted that he did not fill out the wage assignment because it was too difficult. 

A forensic document examiner, Diane Marsh, testified that numbers consistent with a $15,000 transaction appeared under the liquid paper on the RIC, while numbers consistent with an $18,000 transaction appeared on top of the liquid paper.  She further testified that the date on the notice of right to cancel was originally "7/18/95."  Liquid paper was applied over that date and "8/1/95" was written over the liquid paper.

Thomas testified that on August 9, 1995, she signed a completion certificate, certifying that she was satisfied with the work done by one of the subcontractors.  She stated that each of the two subcontractors had his own completion certificate and she refused to sign the other one because the subcontractor never completed the contracted-for work.  Bilfeld stated, however, that the completion certificate signed by Thomas was for all of the work done on Thomas' home.  All of the problems about which Thomas complained had been rectified and, at that time, she was satisfied with all of the work done in her home.  The certificate itself was introduced at trial and provided a preprinted warning stating, "DO NOT SIGN this certificate until you are satisfied that the contractor has carried out his obligations to you and that the work or materials have been satisfactorily completed or delivered in accordance with the terms of your contract with the contractor."  The certificate contained Thomas' signature; however, the blanks providing for the address of the property and the date of the credit application, as well as the boxes specifying whether the work included materials and installation or materials only, were not completed.  There were no notes specifying full or partial completion.

Johnson testified that, on August 23, 1995, he paid Bilfeld $17,450 for assignment of the RIC.  Johnson stated the aforementioned liquid paper was apparent on the face of the RIC, but that Bilfeld told him that Thomas had been present when he made the alterations and had agreed to them.  Johnson admitted on cross-examination that liquid paper was also visible under the date on the notice of right to cancel.  Johnson stated that he received a mortgage document to secure the RIC, which was "probably" blank when he received it.  The mortgage document had been signed by Thomas and dated August 1, 1995.  Bilfeld also gave Johnson the completion certificate discussed above, the signed notice of right to cancel which was dated August 1, 1995, and the blank wage assignment that had been signed by Thomas.  Johnson acknowledged that he and Bilfeld had discussed the mortgage and purchase of the RIC prior to August 1, 1995, and that he had agreed at that time to the purchase provided Bilfeld completed all the required paperwork and the work on Thomas' home.  Johnson also acknowledged that he spoke to Thomas on the telephone on September 29, 1995, at which time she told him the signed completion certificate only pertained to the "outside" work and that the "inside" work was not completed.  As a result, she refused to make any payments.  Johnson further testified that, in a subsequent conversation, Bilfeld told him that the work had been completed and Thomas merely required a "service call."  Johnson received a letter on December 11, 1995, indicating that Thomas had contacted the Better Business Bureau regarding Bilfeld's work. 

On August 28, 1997, Johnson filed a foreclosure action on Thomas' mortgage.  On November 11, 1997, Thomas notified Johnson that she was invoking her option to rescind the agreement.  One week later, she filed an answer and counterclaim against Johnson, alleging TILA violations and slander of title.  The slander of title claim was voluntarily dismissed at trial.

The trial court found Thomas to be a credible witness and "in no way" believed Bilfeld's testimony.  The court concluded that three TILA violations had occurred -- one each on July 18 and August 1, 1995, when Bilfeld failed to make the required TILA disclosures and failed to provide Thomas with copies of the signed documents, and the third when Johnson refused to release the lien on Thomas' home after receiving notice of her election to rescind.  The court further found that Johnson qualified as a "creditor" under the TILA due to his role as Bilfeld's 
de facto
 "partner."  The court based this finding on Thomas' testimony that Bilfeld held Johnson out to be his partner at the time Thomas signed the RIC and the fact that the mortgage to Johnson was signed on August 1, 1995, although he did not become an assignee to the RIC until August 23, 1995.  In the alternative, the court found that even if Johnson was not a creditor, he was liable for the TILA violations as an assignee because they were apparent on the face of the RIC.  The court awarded Thomas $6,000 for the three TILA violations and $59,901 in attorney fees and costs.  Finding the transaction had been properly rescinded, the court declined to foreclose on Thomas' home, but ordered her to pay $10,000 for the reasonable value of the construction work performed.

Johnson appeals the trial court's judgment, contending that the court improperly found him to be a "creditor" pursuant to the TILA and that he is not liable as an assignee because the TILA violation was not apparent on the face of the RIC.  He also contends that Thomas should not have been permitted to rescind the RIC and should not have been awarded attorney fees and costs.  We affirm, but modify the award of damages for the reasons that follow.

ANALYSIS

The purpose of the Truth in Lending Act and its regulations, issued by the Federal Reserve System (Regulation Z) (12 C.F.R. §226.1 
et seq.
 (1995)), is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices."  15 U.S.C. §1601(a) (1994); see also 
Shepeard v. Quality Siding & Window Factory, Inc.
, 730 F. Supp. 1295, 1299 (D. Del. 1990).  In order to do this, TILA and Regulation Z require creditors to disclose certain information upon extending credit to a consumer.  15 U.S.C. §1638 (1994); 12 C.F.R. §226.17 (1995).  "Credit" is defined as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. §1602(e) (1994).  When such credit is extended, the creditor must provide the consumer with the annual percentage rate for the credit, the finance charge, the amount financed, the total of payments and the payment schedule.  15 U.S.C. §1638 (1994).  This information must be provided in a clear, conspicuous manner and a copy of the disclosures must be given to the consumer in writing.  
15 U.S.C. §1632 (1994).  A creditor who fails to make the required disclosures is liable to the consumer according to the monetary penalties specified in the statute.  15 U.S.C. §1640(a) (1994).  An assignee of a creditor is also liable for a creditor's failure to provide the required disclosures when the TILA violation "is apparent on the face of the disclosure statement."  15 U.S.C. §1641 (1994).  The statute is remedial in nature and must be construed liberally in favor of the consumer.  
Ramadan v. Chase Manhattan Corp.
, 156 F.3d 499, 502 (3rd Cir. 1998).  Even mere technical violations provide a basis for liability under the TILA.  
Shepeard
, 730 F. Supp. at 1299.

In reviewing a judgment following a bench trial, we must accept the circuit court's factual determinations unless they are clearly erroneous, and we review its legal conclusions 
de novo
.  
Northwestern National Insurance Co. of Milwaukee v. Lutz
, 71 F.3d 671, 674 (7th Cir. 1995).

In the instant case, we must initially determine whether the trial court properly classified Johnson as a "creditor," as defined by the TILA.  This is a question of law, which we review 
de novo
.  
Market Street Associates Ltd. Partnership v. Frey
, 21 F.3d 782, 785 (7th Cir. 1994).  Once Johnson's status is determined, we may then address his liability for the three TILA violations imposed by the trial court.  We note in this regard that Johnson does not argue the TILA violations did not in fact occur, but merely that he was not a creditor, nor was he liable for the violations as an assignee.

The TILA defines a creditor as

"a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement."  15 U.S.C. §1602(f) (1994).

Johnson does not present an argument regarding the first prong of the definition requiring that a person "regularly extends" consumer credit.  Rather, he limits his argument to the second prong of the definition, contending that, on the face of the RIC, Bilfeld was clearly identified as the creditor,
 i.e.
, the person to whom the debt was initially payable, and Johnson was identified as the assignee.  We agree.

The face of the RIC identifies Thomas as the "Buyer," Davenport Construction Company as the "Seller," and Johnson as the "Assignee" at whose office "Buyer promises to pay to the order of the Seller."  Davenport (Bilfeld) is clearly identified on the face of the instrument of indebtedness as the person to whom the debt is initially payable, thereby making him the creditor in the transaction.  Johnson, who is identified as Bilfeld's assignee, maintains that status despite any preexisting relationship with Bilfeld.

The Staff Commentary to Regulation Z supports this conclusion, stating:

"If an obligation is initially payable to one person, that person is the creditor even if the obligation by its terms is simultaneously assigned to another person.  For example: An auto dealer and a bank have a business relationship in which the bank supplies the dealer with credit sale contracts that are initially made payable to the dealer and provide for immediate assignment of the obligation to the bank.  The dealer and purchaser execute the contract only after the bank approves the creditworthiness of the purchaser.  Because the obligation is initially payable on its face to the dealer, the dealer is the only creditor in the transaction." 
Riviere v. Banner Chevrolet, Inc.
, 184 F.3d 457, 460-61 (5th Cir. 1999), quoting 12 C.F.R. pt. 226, supp. I, subpt. A, comment (2)(a)(17)(i)(2) (1995).

Consistent with this commentary, in 
Ramadan v. Chase Manhattan Corp.
, 229 F.3d 194, 196 (3d Cir. 2000), the assignee's status was not elevated to that of a creditor even though the assignee provided the RIC form to the creditor and the RIC was assigned "contemporaneous with its execution."  Likewise, in 
Mount v. LaSalle Bank Lake View
, 926 F. Supp. 759 (N.D. Ill. 1996), the consumers submitted credit applications to the creditor and signed a contract specifying financing terms.  The consumers were subsequently contacted directly by LaSalle Bank and told they were required to sign a second agreement offering less favorable financing terms than the first.  Although tendered by LaSalle Bank, the second contract stated on its face that it was initially payable to the original creditor and assigned to LaSalle Bank.  Despite these circumstances, the court treated LaSalle Bank as an assignee for purposes of the consumers' TILA claims.  
Mount
, 926 F. Supp. at 765-66.

Similarly, in this case, Bilfeld was identified on the face of the RIC as the seller to whom the obligation was initially payable -- "Buyer promises to pay to the order of the Seller" -- while Johnson was identified as the assignee.  Although Bilfeld and Johnson's conversation prior to August 1, 1995, Bilfeld's description of Johnson as his "partner," and the August 1, 1995, date on the mortgage held by Johnson all indicated that the transaction between Bilfeld and Johnson was anything but at arm's length, according to Regulation Z's staff commentary and the cases discussed above, this evidence did not establish that Johnson was a creditor, instead of an assignee.  We acknowledge that Johnson might have been characterized as a creditor under the TILA prior to its 1980 amendments, which created a "clear divide" between the liability of creditors and assignees.  
Ramadan
, 229 F. 3d at 200, quoting S. Rep. No. 96-368, at 24 (1979), 
reprinted in
 1980 U.S.C.C.A.N. 236, 259; see also 15 U.S.C. §1602(f) (1976) (prior to being amended in 1980, the TILA treated both sellers and lenders as "creditors"); see, 
e.g.
, 
Riviere
, 184 F.3d at 460 (before the 1980 amendments, finance companies were treated as creditors, but are treated as assignees post-1980).  However, the TILA's current definition of a creditor must dictate here and, again, the face of the RIC clearly identified Johnson as an assignee and Bilfeld as the seller/creditor.  Accordingly, we find the court's ruling to the contrary was improper.

Following the determination that Johnson could not be classified as a creditor under the TILA, we must review the court's alternative finding of liability based on Johnson's admitted role as an assignee.  Although Johnson testified at trial that liquid paper was apparent on the face of the RIC at the time he took assignment, he contends on appeal that this was not a TILA violation that was apparent on the face of the instrument because the RIC contained correct information, which was consistent with the installments provided in the proposal.  We disagree.  

Creditors and assignees have "separate and distinct disclosure obligations" under the TILA.  
Jackson v. South Holland Dodge, Inc.
, 197 Ill. 2d 39, 47-48, 
755 N.E.2d 462, 
468 (2001).  The obligations of an assignee are defined in section 1641(a), which was amended in 1980 to provide:

"Except as otherwise specifically provided in this subchapter, any civil action for a violation of this subchapter or proceeding *** which may be brought against a creditor may be maintained against any assignee of such creditor only if the violation for which such action or proceeding is brought is apparent on the face of the disclosure statement ***.  A violation apparent on the face of the disclosure statement includes but is not limited to (1) a disclosure which can be determined to be incomplete or inaccurate from the face of the disclosure statement or other documents assigned, or (2) a disclosure which does not use the terms required to be used by this subchapter."  15 U.S.C. §1641(a) (1994).

The 1980 amendment, which eliminated a consumer's ability to allege liability where an assignee had "knowledge" of a violation even if the violation was not apparent from the face of the instrument, "narrowed considerably the potential scope of assignee liability" (
Taylor v. Quality Hyundai, Inc.
, 150 F.3d 689, 693 (7th Cir. 1998)), thereby making compliance easier and limiting civil liability for statutory penalties to only "significant violations"
 (
Ramadan
, 229 F.3d at 200, citing S. Rep. No. 96-73 (1979), 
reprinted in
 1980 U.S.C.C.A.N. 236, 280; see also 
Jackson
, 197 Ill. 2d at 47-48, 
755 N.E.2d at 
468).  As a result, under the current TILA, creditors are primarily responsible for making the required disclosures and ensuring that they are accurate, while assignees are only liable for violations that a reasonable person could identify from the face of the document.  15 U.S.C. §1641(a) (1994); 
Taylor
, 150 F.3d at 694; accord 
Ramadan
, 229 F.3d at 197.

In this case, Johnson himself testified that liquid paper was visible in the TILA disclosure boxes on the RIC, indicating that changes had been made to the information the TILA requires be disclosed to Thomas.  In addition, there was no evidence, such as Thomas' initials next to the changes, that Thomas had approved those changes.  Because a violation that is apparent on the face of a disclosure statement "includes, but is not limited to" the two examples identified in section 1641(a) (15 U.S.C. §1641(a) (1994)), we agree with the trial court that facial alterations to a disclosure statement, without evidence of the consumer's approval, are a violation that is apparent on the face of the instrument.

Although Johnson is correct that Thomas cites no cases discussing whether an uninitialed alteration, apparent on the face of a disclosure statement, triggers assignee liability, there is support for such a conclusion, as Thomas points out by analogy to the Uniform Commercial Code (UCC) (810 ILCS 5/1-101 
et. seq.
 (West 2002)).  Section 5/3-302 of the UCC provides that the holder of an instrument cannot be a "holder in due course" where the instrument bears apparent evidence of an alteration.  810 ILCS 5/3-302(a)(1) (West 2002).  In 
Northwestern National Insurance Co. of Milwaukee
, as security for a loan to a partnership, the bank received a number of endorsed promissory notes.  One of the notes was signed by the defendant and provided that the defendant promised to pay $69,308 to the partnership in order to finance the purchase of an apartment complex.  
Northwestern National Insurance Co. of Milwaukee
, 71 F.3d at 673.  The defendant's signature appeared on the note in black ink; however, he neglected to fill in a space at the top of the note indicating how many units he wished to purchase.  In blue ink, the number "3" was written in the space at the top of the note and, above the preprinted statement that the defendant promised to pay $69,308, a handwritten caret was inserted and the phrase "per unit" was written above the dollar amount.  Directly below the dollar amount was handwritten "$69,308 x 3 units = $207,924."  The initials RAB (not the defendant's initials) were written next to the changes.  The court found that such changes put the bank on notice that the note had been altered without the defendant's approval.  Therefore, the bank was not a holder in due course and could not enforce the altered terms of the note against the defendant.  
Northwestern National Insurance Co. of Milwaukee
, 71 F.3d at 675.

Although the current action involves TILA considerations and not negotiability considerations under the UCC, we find the analogy to be helpful in that an alteration visible on the face of a negotiable instrument precludes a subsequent holder of that instrument, such as an assignee or endorsee, from enforcing the terms against the signator.  We would think that the trial court here was correct in holding that an alteration visible on the face an instrument of indebtedness would have the same effect, given the requirements of the TILA.  Here, Johnson was certainly put on notice that the RIC had been altered using liquid paper, without any visible indication that Thomas had approved those alterations.  Because, as in 
Northwestern National Insurance Co. of Milwaukee
, the unauthorized alterations were visible, they constituted a violation apparent on the face of the instrument under the TILA.

Citing 
Jackson v. South Holland Dodge
, 197 Ill. 2d 39, 49, 
755 N.E.2d 462, 
469 (2001), Johnson argues he cannot be held liable for Bilfeld's violations because they would have only been apparent to him based on his "experience in the field."  According to 
Jackson
, an " 'awareness of the practices of some creditors can[not] be equated to knowledge that a particular disclosure on a particular TILA form is inaccurate or incomplete.' "  
Jackson
, 197 Ill. 2d at 49, 
755 N.E.2d at 
469, quoting 
Taylor
, 150 F. 3d at 694.  However, Johnson was not imputed with knowledge of the TILA violation based on his experience in the field.  To the contrary
, the trial court found, and we agree, that the unauthorized alterations would have been apparent to an ordinary person and, without evidence of the buyer's consent, they violated the TILA.

Because we have found that Johnson is liable as an assignee and not a creditor, he may only be held liable for the TILA violations committed by Bilfeld that were apparent on the face of the disclosure document.  Although the trial court found Johnson liable for both the July 18 and August 1, 1995, TILA violations, only one violation was actually apparent on the face of the document -- the failure to properly disclose the credit terms as evidenced by the uninitialed changes.  Accordingly, Johnson is liable for only one of these two violations and we reverse the trial court's finding on the second violation.

The trial court determined that Johnson committed a third TILA violation when he refused to release the lien on Thomas' home after she notified him of her election to rescind.  The TILA provides that, in the case of any consumer credit transaction in which a security interest will be retained on any property used as the consumer's principal dwelling, the consumer shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or delivery of the material disclosure and rescission forms, whichever is later.  15 U.S.C. §1635(a) (1994).  Where the notice of right to rescind or any other disclosures required by the TILA and Regulation Z have not been tendered, a consumer's right of rescission expires three years after the date of consummation of the transaction or upon the sale of the property, whichever occurs first.  15 U.S.C. §1635(f) (1994); see also 12 C.F.R. §226.23(a)(3) (1995).  "Any consumer who has the right to rescind a transaction under section 1635 of this title may rescind the transaction as against any assignee of the obligation."  15 U.S.C. §1641(c) (1994).

Johnson argues that Thomas signed all the required and completed disclosures, as well as the rescission notice on August 1, 1995, which created a rebuttable presumption, under section 1635(c) of the TILA (15 U.S.C. §1635(c) (1994) ("written acknowledgment of receipt of any disclosures required under this subchapter *** does no more than create a rebuttable presumption of delivery thereof")), that she received the proper disclosures.  Therefore, her three-day period to rescind began tolling on August 1, 1995, and expired on August 4, 1995, thereby rendering her November 11, 1997, rescission untimely.  However, Johnson fails to address the circuit court's finding that this presumption was rebutted by Thomas' trial testimony that the forms she signed were either blank or incomplete.

Pursuant to section 226.23(b)(1) of Regulation Z, when a transaction is subject to rescission, a creditor must tender two copies of the notice of the right to rescind to the consumer.  12 C.F.R. §226.23(b) (1995); see also 15 U.S.C. §1635(a) (1994).  The notice must be in a document separate from the other disclosures.  12 C.F.R. §226.23(b) (1995).  In addition, it must identify the transaction and "clearly and conspicuously" disclose the following:

"(1) The retention or acquisition of a security interest in the consumer's principal dwelling. 

(2) The consumer's right to rescind the transaction.

(3) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.

(4) The effects of rescission, as described in paragraph (d) of this section.

(5) The date the rescission period expires."  12 C.F.R. §226.23(b) (1995).

The trial court in this case found Thomas' testimony that she signed an incomplete rescission notice on July 18, 1995, to be credible.  We will be not reverse a trial court's credibility determinations unless they are clearly erroneous.  
Anderson v. City of Bessemer
, 470 U.S. 564, 575, 84 L. Ed. 2d 518, 529, 105 S. Ct. 1504, 1512 (1985) (findings based on determinations regarding the credibility of witnesses demand great deference to the trial court's judgment; "only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said").  Because Thomas' testimony was facially plausible, was not contradicted by extrinsic evidence, and was not internally inconsistent, we cannot find the trial court committed clear error.  
Anderson
, 470 U.S. at 575, 84 L. Ed. 2d at 529-30, 105 S. Ct. at 1512.

Thomas stated that at the time she signed the rescission notice, it did not contain the date the rescission period was to expire as required by Regulation Z.  She further stated that she did not sign a revised rescission notice on August 1, 1995, when she signed the second proposal.  This failure to fill in the expiration date on the rescission form violated the TILA and Regulation Z.  
Semar v. Platte Valley Federal Savings & Loan Ass'n
, 791 F.2d 699, 704 (9th Cir. 1986), citing 
Williamson v. Lafferty
, 698 F.2d 767, 768-69 (5th Cir. 1983).  Such a violation entitles the borrower to rescind the loan agreement for up to three years, whether or not the violation was material.  
Williamson
, 698 F.2d at 768-69; 
New Maine National Bank v. Gendron
, 780 F. Supp. 52, 57 (D. Me. 1991) (where a creditor fails to take the necessary actions to start the mandatory three-day rescission period, the period extends to three years from the consummation of the transaction); 
Mayfield v. Vanguard Savings & Loan Ass'n
, 710 F. Supp. 143, 145-46 (E.D. Pa. 1989).
  Because Thomas was not provided with the expiration date on July 18 or August 1, 1995, she was entitled to rescind the agreement for up to three years.

In the alterative, Johnson argues that Thomas herself testified she received copies of all of the disclosure documents in the mail in the fall of 1995.  Therefore, according to Johnson, Thomas' right to rescind expired three days after she received the documents because the failure to properly complete the right of rescission form or any of the required disclosures only extends the rescission period to three days after the disclosures are properly made.  See 
Mayfield
, 710 F. Supp. at 145.  Contrary to Johnson's argument, the record is unclear with respect to which documents Thomas received following her request in the fall of 1995.  Regardless, her receipt of the recission notice at that time would not have cured the failure to provide her with conforming copies of the recission notice on either July 18 or August 1, 1995.

The TILA requires disclosures to be properly made to begin the three-day rescission period.  See 15 U.S.C. §1635(a) (1994).  In order for a rescission notice to comply with the TILA and Regulation Z, it must provide the date the rescission period expires.  See 12 C.F.R. §226.23(b)(1) (1995).  The notice Thomas allegedly received in the fall of 1995 provided that the rescission period expired on August 4, 1995, a date that had long since passed.  To conform with the TILA and Regulation Z, the notice was required to provide a date three days from the date Thomas received the disclosures.  Accordingly, she was not properly notified of her right to rescind and was entitled to three years from the consummation of the transaction, until August 1, 1998, to exercise the right.  See 15 U.S.C. §1635(f) (1994).  Her November 11, 1997, rescission was well within this time frame.

Johnson also contends that Thomas' rescission was improper because she testified at trial that she would have been unable to tender the reasonable value of the work performed within 20 days of the rescission.  The TILA provides: 

"When an obligor exercises his right to rescind under subsection (a) of this section, he is not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by operation of law, becomes void upon such a rescission.  Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, downpayment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction.  If the creditor has delivered any property to the obligor, the obligor may retain possession of it.  Upon performance of the creditor's obligations under this section, the obligor shall tender the property to the creditor, except that if return of the property in kind would be impracticable or inequitable, the obligor shall tender its reasonable value."  15 U.S.C. §1635(b) (1994); see also 12 C.F.R. §226.23(d)(3) (1995).

We disagree with Johnson's interpretation of this section of the statute.  The plain language of the section requires the creditor, or in this case the assignee (see 15 U.S.C. §1641(c) (1994) (where a consumer has the right to rescind a transaction, she may also rescind the transaction as against any assignee of the obligation)), to "
take any action necessary or appropriate to reflect the termination of any security interest created under the transaction" within 20 days of the consumer's rescission (12 C.F.R. §226.23(d)(3) (1995)).  The consumer is not required to tender the reasonable value of the work performed until after the creditor complies with this section.  See, 
e.g.
, 
Brown v. National Permanent Federal Savings & Loan Ass'n
, 683 F.2d 444, 447 (D.C. Cir. 1982) ("under the sequence of events anticipated by the statute, [when a borrower exercises her right to rescind,] the creditor must tender before the borrower's obligation arises"); 
Fairbanks Capital Corp. v. Jenkins
, 225 F. Supp. 2d 910 (N.D. Ill. 2002) (the TILA requires an assignee to take steps to rescind the transaction within twenty days of receipt of the consumer's demand for rescission).  Because Johnson failed to comply with the statute when he refused to lift the lien on Thomas' home within 20 days of her rescission, Thomas was not required to pay the reasonable value of the work at that time.

Furthermore, the statute does not require the consumer to prove she had access to the contract price or the reasonable value of the work performed before exercising her right to rescind.  Although a court may condition rescission upon the tender of the creditor's property or the reasonable value of the work performed, pursuant to its equitable power under section 1635(b) of the TILA (see 
Brown
, 683 F.2d at 447; 
Rudisell v. Fifth Third Bank
, 622 F.2d 243, 254 (6th Cir. 1980)), such a condition was not imposed in this case.  Furthermore, to our knowledge, the courts, including the court in 
Rudisell
 which is cited by Johnson here, have never found that a rescission was ineffective because the consumer did not prove that she was prepared to tender the money at the time of the rescission.  To the contrary, the 
Rudisell
 court concluded that because the consumer kept the creditor's property, the consumer's rescission was conditioned upon the tender of the reasonable value of that property to the creditor.  The 
Rudisell
 court remanded the case to the district court to determine that reasonable value and did not consider the consumer's ability to pay at the time of rescission.  
Rudisell
, 622 F.2d at 254.  This case is comparable to 
Rudisell
 in that the trial court granted rescission and ordered Thomas to pay the reasonable value of the work performed, which was then offset by the award of damages.  We will not reverse the trial court's decision based on a hypothetical theory that Thomas could not have tendered the reasonable value of the work at the time of the rescission.

Because Thomas properly exercised her right to rescind under the TILA and Regulation Z, we agree with the trial court that Johnson's refusal to lift the lien on her home constituted an additional statutory violation.  
Mayfield
, 710 F. Supp. at 145; 
Newton v. United Cos. Financial Corp.
, 24 F. Supp. 2d 444, 445 (E.D. Pa. 1998) (damages may be awarded both for the "failure to honor a valid rescission demand" and for the "creditor's failure to rescind voluntarily").  Therefore, we affirm two of the three TILA violations levied against Johnson by the trial court.

Following this determination, we now address Johnson's contention that Thomas was not entitled to recover attorney fees and costs
 pursuant to 
Brodo v. Bankers Trust, Co.
, 847 F. Supp. 353 (E.D. Pa. 1994).  Whether an assignee may recover attorney fees and costs under the TILA is a question of law to be reviewed 
de novo
.  
Market Street Associates Ltd. Partnership
, 21 F.3d at 785.  Section 1640(a)(3) of the TILA provides, "in the case of any successful action to enforce the foregoing liability or in any action in which a person is determined to have a right of rescission under section 1635 of this title," the consumer may recover "the costs of the action, together with a reasonable attorney's fee as determined by the court."  15 U.S.C. §1640(a)(3) (1994).  In analyzing this section in conjunction with section 1641(a), the 
Brodo
 court deduced that "Congress did not wish to impose liability for damages and attorney's fees on an assignee who was not responsible for and who had no notice of TILA disclosure violations at the time of an assignment."  
Brodo
, 847 F. Supp. at 359.  Subsequently, however, the court in 
Fairbanks Capital Corp. v. Jenkins
, 225 F. Supp. 2d 910 (N.D. Ill. 2002), disagreed with this finding, concluding that a consumer may recover attorney fees from an assignee when the assignee has violated the consumer's right to rescind.

Although we acknowledge this split in authority regarding whether an assignee may be charged with attorney fees and costs where he "had no notice of TILA disclosure violations at the time of an assignment" (
Brodo
, 847 F. Supp. at 359), we have already determined that, in this case, a violation was apparent on the face of the RIC at the time Johnson took assignment.  Accordingly, this case does not fall under the purview of 
Brodo
, which addressed instances where the only TILA violation at issue was an assignee's failure to accept rescission -- a violation not apparent at the time of assignment.  For this reason, we need not discuss the split in authority, and we affirm the trial court's granting of costs and attorney fees to Thomas.

Finally, Johnson contends that, even if we allow the award of attorney fees and costs to stand, the amount of costs should be reduced.  Thomas was awarded $9,000 in costs.  The costs listed in her fee petition included computer legal research, copying, postage, facsimile and telecommunications charges, messenger service, court reporter fees, and other various charges.  Johnson argues that because these items are "overhead" expenses, they are not recoverable under sections 5-108 and 5-109 of the Illinois Code of Civil Procedure (Illinois Code) (735 ILCS 5/5-108, 109 (West 2002)).

Initially, we note that, contrary to the Illinois Supreme Court rules, Johnson provides no argument or legal authority to support the propositions that computer research, copying, postage, facsimile charges, telecommunications charges, messenger service charges, and court reporter fees are overhead and that overhead is not recoverable as a cost of litigation.  See 177 Ill. 2d R. 341(e)(7) (appellant's brief must include an argument containing appellant's contentions and the reasons therefor, with citation to legal authority and pages in the record on which appellant relies).  Aside from the Illinois Code, the only authority to which Johnson refers in support of this argument, is the "Wespic" case.  However, he has provided this court with no citation to the "Wespic" case, nor are we able to locate one.  Despite this deficiency, we will review Johnson's argument and the award of costs granted by the circuit court.  See 
Miller v. Pollution Control Board
, 267 Ill. App. 3d 160, 170, 642 N.E.2d 475, 484 (1994) ("the waiver rule is an admonition to litigants, not a limitation on the jurisdiction of the reviewing court").

A prevailing party may only recover costs where a statute or supreme court rule so provides.  
Irwin v. McMillan
, 322 Ill. App. 3d 861, 864, 750 N.E.2d 1246, 1249 (2001).  "Costs are allowances in the nature of incidental damages awarded by law to reimburse the prevailing party, to some extent at least, for the expenses necessarily incurred in the assertion of his rights in court."  
Galowich v. Beech Aircraft Corp.
, 92 Ill. 2d 157, 165-66, 441 N.E.2d 318, 321 (1982).  As previously stated, the TILA provides for the recovery of costs where a consumer succeeds in an action to enforce the requirements of the statute.  15 U.S.C. §1640(a)(3) (1994).  Likewise, sections 5-108 and 5-109 of the Illinois Code provide that a prevailing party may recover certain costs.  735 ILCS 5/5-108, 5-109 (West 2002).  However, neither statute defines the term "costs" or lists which costs are recoverable.  See generally 15 U.S.C. §1640(a)(3) (1994); 735 ILCS 5/5-108, 5-109 (West 2002).

Generally overhead office expenses, namely expenses that an attorney regularly incurs regardless of specific litigation, including telephone charges, in-house delivery charges, in-house photocopying, check processing, newspaper subscriptions, and in-house paralegal and secretarial assistance, are not recoverable as costs of litigation.  See 
Harris Trust & Savings Bank v. American National Bank & Trust Co. of Chicago
, 230 Ill. App. 3d 591, 599, 594 N.E.2d 1308, 1315 (1992), citing 
Kaiser v. MEPC American Properties, Inc.
, 164 Ill. App. 3d 978, 989, 518 N.E.2d 424, 431 (1987).  Such overhead refers mainly to fixed expenses which are, therefore, already reflected in an attorney's hourly rate.  See 
Harris Trust & Savings Bank
, 230 Ill. App. 3d at 599, 594 N.E.2d at 1315.  As a result, they should not be apportioned to any single cause of action so as to constitute an additional charge.  This definition of overhead does not include charges for expenses specially incurred to third parties specifically in furtherance of a particular cause of action.  See 
Harris Trust & Savings Bank
, 230 Ill. App. 3d at 600, 594 N.E.2d at 1315.  Accordingly, such services for which special payment is made to third parties are treated as independently recoverable costs of litigation.  See 
Harris Trust & Savings Bank
, 230 Ill. App. 3d at 600, 594 N.E.2d at 1315.  Such recoverable costs would include expenses for expert witnesses (see 
Miller
, 267 Ill. App. 3d at 172, 642 N.E.2d at 485), special process servers (see 
Harris Trust & Savings Bank
, 230 Ill. App. 3d at 600, 594 N.E.2d at 1315), depositions (see generally 
Galowich
, 92 Ill. 2d at 166, 441 N.E.2d at 322 (deposition expenses are recoverable where the deposition is necessarily used at trial)), court reporters (see 
Galowich
, 92 Ill. 2d at 166, 441 N.E.2d at 322; 
Miller
, 267 Ill. App. 3d at 173, 642 N.E.2d at 485-86), filing fees (see 
Kaiser
, 164 Ill. App. 3d at 990, 518 N.E.2d at 431), as well as outside messenger services (see 
Harris Trust & Savings Bank
, 230 Ill. App. 3d at 600, 594 N.E.2d at 1315).  

Arguably, even under this analysis, certain routine, minimal out-of-pocket expenses, although paid specially to third parties, such as minimal telephone charges, postage and copying,
 should be treated as overhead costs in that they are routinely incurred in virtually every legal matter handled.  See, 
e.g.
, 
Guerrant v. Roth
, 334 Ill. App. 3d 259, 268, 777 N.E.2d 499, 506 (2002) (photocopying, check processing, newspaper subscriptions and telephone and delivery services are normally included in office overhead).  Only when such expenses are extraordinary in terms of volume and cost, 
e.g.
, in class action suits requiring extensive mailing or voluminous copying, should they be recoverable.  See 
Losurdo Brothers v. Arkin Distributing Co.
, 125 Ill. App. 3d 267, 276, 465 N.E.2d 139, 146 (1984) (duplicating expenses, unless they are extraordinary, are normally associated with office overhead expenses and are included within the attorney's hourly rate).

Under this rationale, the fees for computerized legal research should be, and have been, found to be recoverable in the cases of 
Haroco, Inc v. American National Bank & Trust Co. of Chicago
, 38 F.3d 1429, 1441 (7th Cir. 1994), and 
Guerrant v. Roth
, 334 Ill. App. 3d at 267-68, 777 N.E.2d at 506.  See also 
Wehr v. Burroughs Corp.
, 619 F.2d 276, 285 (3d Cir. 1980); 
In re Media Vision Technology Securities Litigation
, 913 F. Supp. 1362, 1370-71 (N.D. Cal. 1996); but see 
Standley v. Chilhowee R-IV School District
, 5 F.3d 319, 325 (8th Cir. 1993) (costs of computer-based legal research are already reflected in the general claim for attorney fees and cannot be recovered independently).  
The fee for computerized legal research, however, does not fall neatly within the bifurcated categories of overhead versus outside expenditures.  While computer research clearly involves special computer fees engendered by a specific case, courts have observed that, in some cases, the expenditure of these fees inherently provides the attorney with a corresponding benefit reflected in the shortening of his research time.  See 
Haroco, Inc.
, 38 F.3d at 1440; see generally 
Guerrant
, 334 Ill. App. 3d at 268, 777 N.E.2d at 506.  As a result, a distinction must be made, and it has been made in some courts, based upon the billing method for each individual case.  Where the attorney's fee is a contingent one or is otherwise fixed so as not to reflect the actual time spent on a cause of action, the rationale that the computer expense is counter-balanced by a benefit to the attorney in saving time holds water because the fee remains unchanged, while the time expended on research is reduced.  See 
Montgomery v. Aetna Plywood, Inc.
, 231 F.3d 399, 409 (7th Cir. 2000).  On the other hand, where an attorney works on a 
per diem
 basis, the time he saves does not inure to his economic benefit because he will simply be paid for fewer hours, while nevertheless incurring the expense of computer assistance.  Under these circumstances, the rationale for attorney advantage falls away, and the attorney should not be required to absorb the additional expense engendered by computer research fees in light of the diminished billable hours that result from such computer assistance.  In this case, it is apparent from the attorneys' affidavit that Thomas' attorneys charged her for their time on an hourly basis.  Therefore, under the foregoing rationale, there is no reason to preclude them from recovering computer fees.

We note that under some authority, however, even where an attorney is billing 
per diem
 and, therefore, can recover the expense of computer research, the recovery is not considered a cost but is an additional attorney fee.  See 
Haroco, Inc.
, 38 F.3d at 1440; 
Guerrant
, 334 Ill. App. 3d at 267-69, 777 N.E.2d at 506-07.  This is the case because even where the computer expenses are recoverable, they are part and parcel of the attorney's effort and, as such, may be recovered only when attorney fees are recoverable.  Accordingly, where a statute permits the recovery of costs only, but not of attorney fees, computer research expenses would not be recoverable because they fall under the aegis of attorney fees.  However, in our case, we need not concern ourselves with this distinction, as the statute permits the recovery of both attorney fees and costs.  See, 
e.g.
, 
Emmenegger v. Bull Moose Tube Co.
, 33 F. Supp. 2d 1127, 1132 (E.D. Mo. 1998).

Although we have determined that expenses paid to a third party for the purposes of furthering specific litigation, including computerized legal research, messenger services, and court reporter fees, may be recovered by Thomas, before allowing such recovery, the court must determine that the costs were reasonable and necessary.  See 
Haroco, Inc.
, 38 F.3d at 1441; 
Kaiser
, 164 Ill. App. 3d
 at 989, 518 N.E.2d at 431.  Because the court did not specify to what costs the $9,000 award applied and whether those costs were "necessarily incurred" in bringing this cause of action (see 
Galowich
, 92 Ill. 2d at 165-66, 441 N.E.2d at 321-22), we remand the cause solely for clarification and differentiation between overhead and reasonable and necessary recoverable costs.

Finally, although Johnson does not raise an argument regarding a reduction in attorney fees and costs were we to reduce the number of violations imposed by the trial court, we note in this regard that such an exclusion of hours spent on unsuccessful claims is warranted under certain circumstances.  See 
Berlak v. Villa Scalabrini Home for the Aged, Inc.
, 284 Ill. App. 3d 231, 238, 671 N.E.2d 768, 772-73 (1996), citing 
Hensley v. Eckerhart
, 461 U.S. 424, 76 L. Ed. 2d 40, 103 S. Ct. 1933 (1983)
.  However, this clearly is not one of those circumstances since the violations found to have occurred on July 18 and August 1, 1995, involved the same common core of facts and the same legal theories, and therefore, they do not lend themselves to division of the attorney hours spent on each violation.  
Berlak
, 284 Ill. App. 3d at 238-39, 671 N.E.2d at 773, citing 
Hensley
, 461 U.S. at 435, 76 L. Ed. 2d at 51-52, 103 S. Ct. at 1940.  
Therefore, even though we have reduced the number of TILA violations from three to two, the amount of attorney fees and costs need not be reduced for this reason.

Accordingly, the judgment of the circuit court is affirmed in part and reversed in part.  The award of sanctions in favor of Thomas is reduced by $2,000, making the total award $4,000 in sanctions, to be offset by the $10,000 determined by the trial court to be the reasonable value of the work performed.  The cause is remanded for clarification regarding the costs awarded.

Affirmed in part, reversed in part, and damages modified; cause remanded.

O'MALLEY, J. and SMITH, J. concur